In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3142

CHUN RONG JIANG,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,

*Respondent.*

---

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A78 957 311

---

ARGUED APRIL 17, 2007—DECIDED MAY 14, 2007

---

Before KANNE, WOOD, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Chun Rong Jiang applied for asylum, withholding of removal, and protection under the Convention against Torture (CAT) based on religious persecution he claims to have suffered in China both as a Christian and as the founder of an underground church. The immigration judge (IJ) denied relief because he found Jiang's testimony incredible and, alternatively, because he believed that Jiang had suffered only harassment, not persecution. The Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision, and Jiang now petitions for review.

Jiang entered the United States in the summer of 2002 without inspection through Brownsville, Texas, but shortly

after his arrival he was placed in removal proceedings. Within a year of his arrival Jiang applied for asylum, withholding of removal, and relief under the CAT.

In his application and testimony before the IJ, Jiang asserted that he started facing persecution once he founded an underground Christian church in October 2001 in Fujian province. As a child Jiang attended a church run by the Chinese government, but when he became an adult he chafed at the government's use of the church to control Christians and decided to hold religious services at his home. This underground church remained small, but even still he received many warnings from government officials to stop the services.

Jiang also stated that during a church service held in February 2002, four uniformed officers broke into his house. When Jiang asked them if they had a warrant, an officer slapped him in the face, proceeded to search his home, and confiscated all his religious materials. The officers then handcuffed everyone attending the service, including Jiang, and took them to the police station.

Once at the station, Jiang asserted that officers ordered him to squat while they interrogated him about his underground church. During this interrogation the officers repeatedly beat him with batons and pushed him to the ground while his hands remained cuffed. The officers then put him into a cell with four other prisoners who repeatedly beat him; he testified that the guards instigated this violence and never intervened to protect him. After seven days, Jiang's relatives gathered enough money to pay a fine and he was released.

Following his release Jiang testified that he immediately went to the hospital, where he stayed for two weeks while doctors treated his injuries. Jiang submitted medical records demonstrating that he had suffered soft tissue injuries, swelling, and bruising on his abdomen and legs.

According to Jiang, upon his discharge from the hospital he was prohibited from attending church, lost his job at a state-owned hotel, and was required to report to the police weekly, all of which motivated him to flee China. Within one day, he procured commitments from family members to pay—once he arrived safely in the United States—the $60,000 fee required to smuggle him out of China on a fraudulent passport.

The IJ denied Jiang's application for relief. The IJ discredited Jiang's testimony based on: (1) his "lack of knowledge" about Christianity; (2) his testimony that he arranged to leave China in one day, an account the IJ found implausible; (3) Jiang's purportedly inconsistent testimony regarding his fraudulent Chinese passport; and (4) the medical records, which the IJ described as "suspect." Alternatively, the IJ concluded that, even assuming that Jiang testified credibly, the harm he faced did not rise to the level of persecution. Since Jiang did not qualify for asylum, the IJ also denied Jiang's applications for withholding of removal and relief under the CAT. The BIA adopted and affirmed the IJ's decision with a one-paragraph order that contained no additional analysis.

Jiang argues on appeal, and we agree, that none of the IJ's four reasons for rejecting his testimony are supported by substantial evidence. Jiang first maintains that the IJ erred by discrediting his testimony that he led an underground church. Specifically, Jiang contends that the IJ erred by concluding that he lacked knowledge about Christianity based not on the record but on the IJ's own beliefs about Christianity and what should be common knowledge for Christians in China.

We will overturn an IJ's adverse credibility determination if it is not supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006) (citations omitted).

Findings that rest on an IJ's own speculation, conjecture, or unsupported personal opinion are improper. *Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005); *Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004). Likewise, an IJ's "personal beliefs or some perceived common knowledge about the religion . . . [are] not a proper basis for an adverse credibility finding." *Huang v. Gonzales*, 403 F.3d 945, 949 (7th Cir. 2005).

Jiang correctly argues that the IJ impermissibly relied on personal beliefs and his perceived common knowledge when concluding that Jiang "has, at best, rudimentary if any knowledge about Christianity." We have cautioned IJs against using an applicant's "ignorance of the details of religious doctrine . . . as evidence that an individual is not a true believer," *Muhur v. Ashcroft*, 355 F.3d 958, 961 (7th Cir. 2004); *see also Huang*, 403 F.3d at 949; *Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005), but that is precisely what the IJ did here as evidenced by this example:

> IJ: Are you aware of the biblical injunction render unto Caesar the things that are Caesar's and to God the things that are God's . . . .
>
> Jiang: As far as my basic belief, understanding of the Bible is that—
>
> IJ: What I'm asking you is to explain the phrase to me.
>
> Jiang: I cannot explain very thoroughly because my understanding of the Bible is very limited and my understanding of, the basic understanding is the truth and the path . . . .
>
> IJ: Well, the reason I ask you this particular phrase is because . . . the phrase is well-known . . . . I thought, that you would know it.

The IJ assumed that Jiang would be familiar with and understand this particular biblical text. The IJ used

Jiang's inability to interpret it as evidence that he was not, as he claimed, a real Christian. This is a bit like concluding that someone is not a baseball devotee because he can't explain the intricacies of the balk rule. The IJ also questioned Jiang about the difference between the Old and New Testaments but rejected his response, even though Jiang identified Adam, Eve, Isaac, and Solomon; described Jesus as "savior"; and described the New Testament as the story of Jesus and his 12 disciples and how they "fight with evil," "cure the diseases," and "spread the gospels."

In the Profile of Asylum Claims, the Department of State informs adjudicators that "because of a lack of access to religious training and literature, some committed Chinese Christians may have difficulty responding to" simple doctrinal questions. Instead of accounting for this limited doctrinal knowledge, the IJ here erroneously discredited Jiang's testimony based on an exaggerated notion of how much people in China actually should know about Christianity.

Jiang next argues that the IJ impermissibly relied on speculation and conjecture when he discounted as implausible his account of arranging to leave China on short notice, without pre-paying any portion of the smuggling fee. Jiang maintains that the manner in which he fled China is irrelevant to the heart of his claim of religious persecution and that, in any event, the IJ rejected this testimony based on his own opinions about how smuggling operations work in China.

As an initial matter, an "IJ's adverse credibility finding must be based on issues that go to the heart of the applicant's claim," *see Adekpe v. Gonzales*, No. 05-3951, 2007 U.S. App. LEXIS 5840, at *16, *24 (7th Cir. Mar. 14, 2007) (citations omitted), and the manner in which Jiang was smuggled out of China has nothing to do with his claim of

religious persecution. Moreover, we have previously reversed an IJ's adverse credibility finding when it was based on his own assumptions of how long it should take Chinese residents to arrange passage to the United States, *see Chen*, 420 F.3d at 709-10; the IJ made the same assumptions here. A 2004 report on China, released by the United Kingdom's Immigration and Nationality Directorate, reveals that Fujian province has a "huge" network of smugglers that work in concert together, including transporters, guides, and corrupt public officials, and the IJ pointed to no evidence suggesting that this sophisticated ring of smugglers was incapable of arranging for Jiang's departure in one day. And contrary to the IJ's assumption, this same report and newspaper articles submitted by Jiang reveal that many of those smuggled out of China do not pay any portion of their fee before leaving, and that debt collectors based in the United States and China ensure payment upon safe arrival. The IJ erred by discrediting Jiang's account of arranging to leave China in one day without first paying his smugglers.

Jiang also maintains that the IJ mischaracterized his testimony when the IJ concluded that he testified inconsistently regarding whether he traveled with a valid passport and when he obtained a passport. Jiang contends that he consistently testified that he received a fraudulent passport from a smuggler the day he left China.

A review of the record reveals that the IJ did mischaracterize Jiang's testimony, and that cannot justify an adverse credibility finding. *See Ssali v. Gonzales*, 424 F.3d 556, 563 (7th Cir. 2005); *Lin*, 385 F.3d at 753. Jiang did testify on direct examination that he had no valid passport when he left China, but his testimony is consistent with his later revelation that he presented the INS with a fraudulent passport bearing his name and picture. The IJ also noted that the fraudulent passport was purportedly issued in September 2001, and the IJ

found this inconsistent with Jiang's testimony that he decided to leave China in March 2002. But the IJ's finding overlooked Jiang's explanation that the issuance date, like the rest of the passport, was fraudulent and that he did not receive the fake passport until the day he left China.

Jiang also maintains that the IJ erroneously discounted the records of his two-week hospital stay. Jiang argues that the IJ found these documents "suspect" not based on record evidence, but based on his own assumptions regarding what information is included in Chinese hospital documents. We agree with Jiang on this point.

The IJ stopped short of calling the medical records fraudulent, but he was "skeptical of the records" because they stated in "colloquial and layman's language" that Jiang "sustained unbearable pain and discomfort." This characterization ignores the hospital records' more precise description of Jiang's diagnosis—which includes swelling, bruising, and soft tissue injury, particularly in the abdomen below the navel and on both of his legs—and fails to recognize that a more professional tone could have been simply lost in translation. What's more, the IJ did not point to anything in the record to support his suggestion that the hospital records were not genuine. *See Ayi v. Gonzales*, 460 F.3d 876, 883 (7th Cir. 2006) (vacating adverse credibility finding based on IJ's speculation that documents were forgery); *Uwase v. Ashcroft*, 349 F.3d 1039, 1042 (7th Cir. 2003).

Jiang also contends that the record compels this court to overturn the IJ's alternative finding that Jiang's experiences did not rise to the level of persecution. Jiang argues that the IJ reached this finding by impermissibly considering only his detention and beating at the hands of the police and ignoring other evidence of persecution, like his testimony about the repeated beatings by other prisoners at the instigation of the police, the illegal search of his home, and the confiscation of his religious materials.

Persecution is "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004) (citations omitted). We have recognized that "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture may be sufficient to establish persecution," *Soumahoro v. Gonzales*, 415 F.3d 732, 737 (7th Cir. 2005) (citations omitted), but the harm suffered must rise above the level of "mere harassment." *Liu*, 380 F.3d at 312. Finally, the IJ is required to consider the evidence as a whole when determining whether an asylum applicant has suffered persecution in the past. *See Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006).

In concluding that Jiang had not suffered past persecution, the IJ erroneously focused only on Jiang's detention and beating, concluding that "[t]o be sure, kicking and then injury to the soft tissue around the stomach is mere harassment." The IJ failed to consider the entire sequence of experiences that Jiang underwent. The IJ made no mention of Jiang's testimony that he was prohibited from attending church, that police illegally searched his home, that police confiscated his religious materials, and that police continued to track his whereabouts after his release by requiring him to check in weekly. *See Gomes v. Gonzales*, 473 F.3d 746, 754 (7th Cir. 2007) (remanding where IJ concluded that breaking into alien's home, confiscating property, and threatening at knife point constituted harassment); *Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) ("A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution."); *Gjerazi*, 435 F.3d at 808 (noting that persecution may include illegal searches, confiscation of property, and surveillance). The IJ also neglected to sufficiently address the repeated beatings

that Jiang claims to have suffered at the hands of other prisoners during his week-long detention. The government can abet—and thus become responsible for—private discrimination by inciting religious violence or refusing to protect a target of such violence. *See Gomes*, 473 F.3d at 754. Here, Jiang repeatedly and consistently testified that the police instigated and refused to prevent these attacks.

Finally, Jiang argues that even if the court upholds the IJ's finding that he experienced only harassment in the past, he is still eligible for asylum based on his well-founded fear of future persecution. In his asylum application and testimony, Jiang explained that he feared detention and physical abuse if he returned to China and that, according to his parents who remain in China, police officers visit their home weekly looking for him. Despite this evidence the IJ failed to make a finding regarding Jiang's fear of future persecution, and that's yet another reason this case requires a remand. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i) (describing eligibility for asylum based on well-founded fear of future persecution); *Mema v. Gonzales*, 474 F.3d 412, 418 (7th Cir. 2007) (remanding where IJ failed to sufficiently consider evidence of applicant's fear of future persecution).

Accordingly, we GRANT the petition for review, VACATE the removal order, and REMAND for a new hearing.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
