[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10997

_____

Agency No. A096-345-280


JIAREN SHI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 5, 2013)

Before MARCUS and MARTIN, Circuit Judges, and GOLD,[*] District Judge.

MARCUS, Circuit Judge:

Petitioner Jiaren Shi seeks review of a Board of Immigration Appeals

("BIA") decision denying him asylum. In proceedings before the immigration

_____

[*] Honorable Alan S. Gold, United States District Judge for the Southern District of Florida,
sitting by designation.

judge ("IJ"), Shi, a Chinese national, alleged that he had suffered past religious persecution on the basis of a 2002 incident, during which the police busted up a Christian church service in his father's home and arrested his father, who was the leader of the church, Shi himself, and seven or eight other worshippers. According to Shi, the police detained him for seven days, interrogating him twice and subjecting him to physical abuse. After one interrogation session, the police handcuffed Shi to an iron bar and left him outside in the rain overnight, after which he became ill. The IJ denied Shi asylum on several grounds, including a finding that his testimony was incredible. The BIA, however, assumed for its purposes Shi's credibility and instead denied Shi asylum based solely on its determination that the alleged abuse, even if true, did not rise to the level of persecution. At issue in this appeal is whether Shi's account, if true, compels a finding of past persecution. We hold that it does and, therefore, remand to the BIA for further proceedings consistent with this opinion.

## I.

### A.

Because the BIA assumed Shi was credible, the following facts are taken from Shi's testimony before the IJ. Shi was a resident of Fujian Province in the People's Republic of China. In October 1999, Shi became a Christian at the behest of his father, who founded a "home church" or "family church," with a small

2

congregation of twelve or thirteen members. Shi's father's church was not sanctioned by the Chinese authorities.

During a service held at Shi's family home on April 7, 2002, four policemen broke up the meeting and told the congregants to hold their hands up to their heads and face a wall. The police confiscated the group's Taiwanese bibles and arrested the nine or ten worshippers present, including Shi and his father, who was leading the service. During the arrest, the police referred to the church service as an "illegal meeting," a phrase they would repeat throughout Shi's ordeal. After taking the group to the police station, the police searched, booked, and interrogated each church member separately. Two policemen interrogated Shi regarding the history of the church, the composition of its membership and its leadership, and how his father communicated with anti-government forces in Taiwan; but Shi insisted the church met only for religious worship. During this first interrogation session, a police officer slapped Shi in the face and also kicked his chair out from underneath him, causing Shi to fall to the floor. Dissatisfied with Shi's answers, the officer accused Shi of not telling the truth and threatened to beat him with a baton.

After the police had detained Shi for four days, they again interrogated him, but Shi was too frightened to respond. This time, the police told Shi that he had been brainwashed and that his mind had been "poisoned." When Shi still did not respond to their questions, the policemen took him outside behind the back of the

3

police building and handcuffed him to an iron bar. It was raining, and Shi was left outside, chained to the iron bar throughout the night. Eventually, the police removed the restraints and took him back inside the following morning at six or seven o'clock. After the incident, Shi became sick, suffering from a high fever and a sore throat. When his condition did not improve after two days, the police allowed his mother to bail him out for 5,000 renminbi ("RMB")[1] because, according to Shi, they feared he would die in their custody. Before releasing him, the police wanted Shi to write a letter promising not to participate in future "illegal meetings," but Shi did not do so. His mother immediately took him to see a doctor as a result of the fever.

Shi's father was sentenced to five years due to his position as the leader of the church, although he has since been released and currently resides in China. Shi's uncle arranged for Shi to flee to the United States shortly after the police released him. Shi initially arrived in Canada, on or about June 7, 2002, and then entered the United States by car roughly a week later. Shi has lived in several cities and currently resides in New York,[2] and he has attended several Christian churches in those cities.

B.

---

[1] Renminbi, also referred to as Chinese yuan, is the official currency of the People's Republic of China.

[2] From the record it appears that Shi moved to New York during the pendency of his immigration proceedings, which all took place in Atlanta, Georgia. In 2010 Shi requested a change of venue to New York, but the IJ denied this motion.

Shi applied for asylum in January 2003. The Department of Homeland Security ("DHS") commenced removal proceedings against Shi in 2008, charging him with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without being admitted or paroled. Based on his claim of religious persecution, Shi applied for asylum pursuant to 8 U.S.C. § 1158; withholding of removal pursuant to 8 U.S.C. § 1231(b)(3); and relief under the United Nations Convention Against Torture ("CAT") pursuant to 8 C.F.R. §§ 1208.16 and 1208.18.

The IJ denied Shi's application for all three forms of relief for several reasons. First, because Shi testified inconsistently about his date of entry into the United States, the IJ found that Shi had not established by clear and convincing evidence that he filed his asylum application within one year of entry. The IJ further found that Shi's testimony was incredible due to internal inconsistencies in his testimony, including an inconsistency regarding his date of entry, his inability to state his place of entry, and suspicions that documentary evidence had been prepared specifically to support his asylum claim. The IJ also held that Shi's testimony, even if true, did not meet this Circuit's legal standard for persecution. The IJ explained that persecution is an "extreme concept" and requires "more than a few isolated incidents of verbal harassment, intimidation, or one time

5

incarceration." According to the IJ, what occurred to Shi in China did not rise to the extreme level required to demonstrate past persecution.

The IJ then considered Shi's claim that he had a well-founded fear of future persecution. Since the IJ found Shi's account incredible, Shi could not meet the subjective component of this standard. The IJ also held that Shi's fear was not objectively reasonable because the church to which he belonged still existed in China, and his father was not a target of government persecution despite continuing to lead the church. The IJ further determined that, since Shi could not meet the standard for asylum, he also failed to meet the higher bar required for withholding of removal. Finally, the IJ denied Shi CAT relief, finding it improbable that the government would torture him upon return to China. Shi appealed this decision to the BIA.

The BIA affirmed the IJ's denial of relief. Although the IJ found Shi incredible and also found that Shi did not timely file his application, the BIA assumed for purposes of its decision that Shi's account was credible and that his application was timely. The BIA instead based its denial of asylum on the legal conclusion that the harms Shi alleged -- being detained for a week, suffering physical abuse, and being handcuffed outside overnight in the rain -- did not amount to persecution.

The BIA next held that Shi had not met his burden of establishing that he had a well-founded fear of future persecution. Thus, the BIA concluded Shi could not establish eligibility for asylum, from which it followed a fortiori that Shi was ineligible for withholding of removal. Finally, the BIA held that Shi had failed to prove it was more likely than not he would be tortured by, or with the acquiescence of, public officials or others acting in an official capacity in China. Shi timely appealed this decision.

## II.

We review "only the BIA's decision," except to the extent that it "expressly adopt[s] the IJ's opinion or reasoning." Imelda v. U.S. Att'y Gen., 611 F.3d 724, 727 (11th Cir. 2010). We review a factual determination that an alien does not have a well-founded fear of persecution under the substantial evidence test. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005). Thus, we must affirm if the BIA's decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Imelda, 611 F.3d at 727 (internal quotation marks omitted). Under this standard, reversal requires finding "that the record not only supports reversal, but compels it." Id. at 728 (quoting Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003)). Since the BIA assumed Shi's credibility, we must do so as well. See, e.g., Cruz-Samayoa v.

7

Holder, 607 F.3d 1145, 1150 (6th Cir. 2010); Li v. Att'y Gen. of the U.S., 400 F.3d 157, 163-64 (3d Cir. 2005).

The only part of the BIA's decision that we consider is the denial of Shi's asylum claim. Shi contends that, accepting the entirety of his harrowing account as true, we are compelled to find that he suffered past persecution based on his religious affiliation and, therefore, he is a refugee protected from deportation by the Immigration and Nationality Act ("INA"). The INA gives the Secretary of Homeland Security or the Attorney General the power to "grant asylum to an alien who has applied for asylum" in accordance with established procedures "if the Secretary . . . or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). Section 1101(a)(42) in turn defines a refugee as:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).

The burden of proof is on the applicant for asylum to establish that he or she is a refugee. 8 C.F.R. § 208.13.  There are two ways to establish refugee status. First, "[a]n applicant shall be found to be a refugee on the basis of past persecution

if the applicant can establish that he or she has suffered persecution in the past . . . on account of [a number of protected grounds, including religion] . . . ." 8 C.F.R. § 208.13(b)(1). An alien who has established past persecution "shall also be presumed to have a well-founded fear of persecution," id., a presumption that may be rebutted if the IJ finds that there is either "a fundamental change in circumstances" in the alien's home country or that the alien "could avoid future persecution by relocating to another part of the . . . country." 8 C.F.R. § 208.13(b)(1)(i)(A), (B); see also Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1351-52 (11th Cir. 2009).

At the outset, we recognize that the current appeal does not present several questions that in other asylum cases are often outcome-determinative. In the first place, the BIA assumed that Shi was credible for purposes of its analysis. Since we review only the BIA's decision, Imelda, 611 F.3d at 727, we cannot and do not scrutinize the IJ's credibility determination and instead take the facts outlined in Shi's testimony as true. Second, the government has not argued either that there has been a fundamental change in circumstances or that Shi could relocate in China to avoid persecution. Finally, although a petitioner bears the burden of proving his persecution was on account of a protected ground, see Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006), the government has never disputed that Shi was abused by the Chinese authorities based on a protected ground, i.e., his

9

religion. Thus, the only question presented on appeal is whether the record compels the conclusion that Shi suffered past persecution when his church service was broken up, his family's bibles were confiscated, and he was detained for seven days, slapped, thrown to the floor, and handcuffed to an iron bar overnight outside in the rain.

We hold that it does, since the conduct Shi alleges represents an extreme and egregious suppression of his religious practice. Our case law establishes that persecution is "an extreme concept that does not include every sort of treatment our society regards as offensive." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) (quoting Ghaly v. INS, 58 F.3d 1425, 1431 (9th Cir. 1995)). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." Id. (quoting Mikhailevitch v. INS, 146 F.3d 384, 390 (6th Cir. 1998)). It is important to note, however, that we evaluate the harms a petitioner suffered cumulatively -- that is, even if each fact considered alone would not compel a finding of persecution, the facts taken as a whole may do so. See Ruiz v. Gonzales, 479 F.3d 762, 766 (11th Cir. 2007). Since determining what constitutes persecution is a highly fact-intensive inquiry, the courts are obliged to consider the totality of the circumstances on a case-by-case basis. Cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 448 (1987).

10

As we see it, the totality of the circumstances presented in this case are extreme enough to compel a finding that Shi suffered past persecution on account of practicing his religion in China. The first set of facts that strongly cuts in favor of finding persecution is that the incident began with the interruption of a private church service and ended with an attempt to coerce Shi to abandon his religious convictions and to promise to never again attend a church meeting like the one that led to his detention in the first place. According to Shi's testimony, at a Christian church gathering held at his family's home on April 7, 2002, four policemen entered the home, busted up the religious meeting, and arrested nine or ten members of the congregation, including Shi and his father, who was the group's leader or pastor. The police pronounced that the congregants were participating in an "illegal meeting," which was the sole justification for their arrest. Indeed, when the police released Shi seven days later, they asked him to write a letter vowing not to attend any more "illegal meetings" and to cease having contact with Taiwan -- which was the source of the Shi family's religious materials. There is no evidence in the record that Shi and his family were targeted because they had engaged in protests of religious oppression in China that would have drawn the Chinese authorities' attention to the group's April 7 meeting. In fact, the record demonstrates quite the opposite: the police described the religious meeting itself as "illegal."

11

It is no exaggeration to say that, since its founding, the United States has abhorred the notion that governments may constrain a citizen's right "to practice one's faith," let alone break up a church meeting, seize religious materials, and incarcerate all of the worshippers. See Kazemzadeh, 577 F.3d at 1358 (Marcus, J., concurring). For this reason, the Constitution enshrines the right to practice one's faith, see U.S. Const. amend. I, and notably the "[f]reedom of religious practice also resonates within the [Immigration and Nationality Act]'s legislative history." Kazemzadeh, 577 F.3d at 1359 (Marcus, J., concurring).

The asylum provisions of the INA were incorporated into law in the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980), and its supporters repeatedly invoked "the founding legacy of our nation as a powerful motivation for the creation of the statutory scheme protecting asylum seekers from religious persecution." Kazemzadeh, 577 F.3d at 1359-60 (Marcus, J., concurring). Thus, for example, Senator Strom Thurmond "invoked our nation's history as a refuge for those escaping religious persecution," id. at 1360, stating that the Act itself would "tell those who come after us that we were true to our heritage as a people and a Nation . . . ." 125 Cong. Rec. S23231, S23238 (1979); see also 126 Cong. Rec. H4498, H4503 (1980) (statement of Rep. Danielson) ("[T]raditionally America is the land of people in need, people who are troubled and seek refuge."). Moreover, the Act "was created in response to some of the world's largest . . . refugee crises,"

12

including "the need to protect Soviet Jewish refugees, Middle Eastern Christian refugees, and Iranian minorities from religious persecution." Kazemzadeh, 577 F.3d at 1360 (Marcus, J., concurring) (citing U.S. Refugee Programs, Hearing Before the S. Comm. on the Judiciary, 96th Cong. 4, 7-8, 13 (1980)). Thus, the suppression of religious practice is precisely the kind of persecution from which Congress sought to protect refugees.

It is also notable that the police in this case confiscated the group's bibles. As the Seventh Circuit noted in a similar case, "the IJ is required to consider the evidence as a whole when determining whether an asylum applicant has suffered persecution in the past." Jiang v. Gonzales, 485 F.3d 992, 997 (7th Cir. 2007). In Jiang, the petitioner alleged that the police broke up his church service, searched his home and confiscated his religious materials, and then arrested and detained him for seven days, during which they beat him. "In concluding that Jiang had not suffered past persecution, the IJ erroneously focused only on Jiang's detention and beating" and denied that those harms rose to the level of persecution. Id. However, "[t]he IJ failed to consider the entire sequence of experiences that Jiang underwent. . . . [Jiang] was prohibited from attending church, th[e] police illegally searched his home, . . . confiscated his religious materials, and . . . continued to track his whereabouts after his release by requiring him to check in weekly." Id. In Jiang, these additional circumstances heavily weighed in favor of finding persecution,

13

and the failure to address them at all led the Seventh Circuit to remand the case for a new hearing. See id. at 997-98.

Still another significant fact lending further support to finding persecution is the length of Shi's detention following his arrest: in this case, seven days. During that time, the police interrogated Shi twice, slapped him in the face, kicked his chair out from underneath him, and threatened to beat him with a baton. While this Court has declared in past cases that a brief detention combined with some physical abuse is not sufficient to compel a finding of persecution, it has never done so when the detention lasted an entire week. In Zheng v. U.S. Att'y Gen., 451 F.3d 1287 (11th Cir. 2006), for instance, the petitioner was detained for five days and alleged that he was forced to watch and read anti-Falun Gong materials. Id. at 1289. At one point, he was dragged to a detention yard where he stood in the sun for two hours. Id. In Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1171 (11th Cir. 2008), the petitioner was detained for 36 hours at a police station, "ordered to disrobe and . . . beaten with a belt and kicked." On the other hand, we have concluded that longer periods of detention supported a finding of persecution. See, e.g., Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211, 1217 (11th Cir. 2007) (the cumulative effect of several incidents, including a fifteen-day detention, compelled a finding of persecution).

14

Perhaps most importantly, what compels us to find, in this case, that Shi was persecuted is an additional fact that highlights the unusual nature of the authorities' efforts to suppress Shi's religious practice. During Shi's second interrogation session, the police became visibly angry that he failed to answer their questions, characterized him as brainwashed, and said his mind had been "poisoned." The police then took Shi outside behind the building, handcuffed him to an iron bar, and left him there to soak in the rain overnight, only taking him back inside at six or seven o'clock the next morning. That day, Shi began battling a high fever and a sore throat, and his condition was serious enough that he did not recover after two days. The police, according to Shi's account, feared that he would die in jail and released him to his mother's custody after she paid a 5,000 RMB bond to secure his freedom; she then took Shi to a doctor for treatment. This conduct when taken as a whole exceeds the abuse presented in Zheng and Djonda, and makes it very hard for us to simply characterize what the police did to Shi as mere "harassment or intimidation," Gonzalez, 212 F.3d at 1355.

In an earlier case, the Ninth Circuit held that a similar fact pattern compelled a finding of past persecution. See Li v. Holder, 559 F.3d 1096, 1108 (9th Cir. 2009). In Li, the police broke up a church service in Jilin Province, China, and arrested the petitioner and his fellow congregants. Id. at 1099-1100. The officers began interrogating the group one by one, and, when Li refused to disclose the

15

identity of the church's membership, the police "began to hit and punch the handcuffed Li in the face" before kicking him onto the floor. Id. at 1100. When Li continued to refuse to cooperate, the officers told him he would "'suffer . . . the consequences,' . . . stripped him down to his underwear and tied him to an electric pole" outside the building. See id. at 1101. It was the winter, and "the officers left Li, who was bleeding and still handcuffed, exposed to the below-freezing temperature for nearly an hour." Id. Afterward, the police sent Li to a labor camp for two weeks, where he suffered additional beatings, and following this whole ordeal Li required medical attention. See id. at 1108. Describing this treatment as "brutal," id. at 1107, the Ninth Circuit held that "[t]he totality of the circumstances demonstrated that Li was persecuted," see id. at 1108.

The conduct Shi alleges is in many ways comparable to the mistreatment in Li, where the police handcuffed the petitioner outside in the freezing cold. Just like Li, Shi's encounter with the Chinese authorities began with the police breaking up a worship service held in a congregant's home. Like Li, Shi too was interrogated about the membership and leadership of his church. And, when he refused to give in to the coercive interrogation, Shi was handcuffed and spent the night chained to an iron bar while it rained. Shi also had to receive medical attention upon his release from custody.

16

Perhaps one comparative measure of the severity of the conduct at issue may be drawn from a wholly different legal context, where the Supreme Court has held that a similar and infamous penological tactic -- tying a prisoner to a so-called "hitching post" -- amounts to cruel and unusual punishment forbidden by the Eighth Amendment. Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002). As the Court explained, the use of the hitching post "subjected [the prisoner] to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, [and] to unnecessary exposure" to the elements. Id. at 738. "The use of the hitching post under these circumstances violated the basic concept . . . [of] the dignity of man." Id. Indeed, the use of a hitching post was so extreme that in Hope the state officials who employed it could not receive qualified immunity even though there was no existing case law explicitly forbidding such a practice. As the Supreme Court put it, "the violation was so obvious" that any responsible official, attempting to obey the Constitution, would have known it violated the Eighth Amendment. See id. at 741; accord id. at 745 ("The obvious cruelty inherent in this practice should have provided respondents with some notice . . . . Hope was treated in a way antithetical to human dignity.").

While the analog to the Eighth Amendment is in no way perfect, the corporal punishment Shi recounted is similar to the use of a hitching post; just as a

17

prisoner punished at the hitching post "was treated in a way antithetical to human dignity," id. at 745, so too the authorities' abuse of Shi was brutal, inhumane, and extreme. In this case, the police handcuffed Shi to an iron bar overnight, outdoors and in the rain, after which Shi became ill enough that the authorities released him, apparently for fear he would die in their custody. While the BIA focused on the severity of this punishment and treated chaining Shi to an iron bar in the rain as a type of physical abuse to be measured against the physical abuse found in other cases, we evaluate the severity of that abuse in context, mindful that this act was the culmination of a series of coordinated actions that punished Shi for, and prevented him from, practicing his religion in China. The totality of these circumstances rises to the extreme level required to compel a finding of persecution.

To the extent that the BIA's decision equated the alleged conduct in this case with that in Zheng and Djonda, those cases are distinguishable. As we explained earlier, each asylum case turns on its own facts, and those cases lack several of the crucial facts identified above. For one thing, the duration of the detentions at issue in those two cases is indisputably shorter than the week-long detention that Shi experienced. Moreover, neither of those cases involved the interruption of a private church service or the confiscation of religious materials that render the police's persecution of Shi particularly invidious and antithetical to the INA's basic

18

principles. Finally, neither of those cases confronted as singularly cruel a tactic as handcuffing an individual to an iron bar, outside and overnight, in the rain, in order to facilitate an interrogation. While some of the elements found in this case -- for instance, Shi being slapped in the face or having a chair kicked out from under him -- plainly would not compel a finding of persecution standing alone, again we evaluate the conduct cumulatively. In this case, the authorities subjected Shi, over the course of seven days, to a wide variety of harms in a concerted effort to repress his religious exercise: interruption of a private church service, arrest, interrogation, detention, confiscation of property, and a severe act of physical abuse. Those disturbing circumstances leave us convinced that, if Shi's account is to be credited, the Chinese authorities persecuted Shi on account of his religion.

We therefore reverse the BIA's determination that the conduct Shi has alleged did not amount to persecution. Because, pursuant to 8 C.F.R. § 208.13(b)(1), a finding of past persecution satisfies a petitioner's burden of demonstrating a well-founded fear of persecution, we have no occasion to address the BIA's holding that Shi otherwise failed to meet the burden of establishing that he had a well-founded fear of future persecution. Instead, we remand to the BIA to reconsider this case consistent with the legal conclusion we have outlined.

PETITION FOR REVIEW GRANTED; VACATED AND REMANDED.