[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13262
_____

Agency No. A200-915-056

SAIZHU WANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(November 24, 2014)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,[*] District Judge.

HULL, Circuit Judge:

---

[*]Honorable Amy Totenberg, United States District Judge for the Northern District of Georgia, sitting by designation.

Saizhu Wang, a native and citizen of China, petitions for review of the Board of Immigration Appeals's ("BIA") dismissal of her appeal from the Immigration Judge's ("IJ") denial of her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). See 8 U.S.C. §§ 1158, 1231. The BIA found that Wang failed to establish that she has a well-founded fear of persecution based on her conversion to Christianity or that she is likely to be tortured when she returns to the Fujian Province in China. After careful review, and with the benefit of oral argument, we deny Wang's petition.

## I. BACKGROUND FACTS

In December 1998, Wang illegally entered the United States without inspection. In 2010, the Department of Homeland Security ("DHS") issued a notice to appear, charging Wang as removable pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), for having entered the United States without being admitted or paroled by an immigration officer. Wang does not challenge her removability.

**A.    Application for Asylum, Withholding of Removal, and CAT Relief**

In August 2010, Wang filed an application for asylum, withholding of removal, and CAT relief based on her religion. Wang attached a personal statement in which she attested that she feared persecution in China based on her

2

Christian belief and her intent, if she returned there, to attend an illegal underground "house church" rather than a state-controlled public church. She was afraid the government would detain her if she was caught attending a house church because her sister-in-law, Chunmei Liu, had been arrested after she was caught attending a house church, was kept for several days, and was warned not to attend underground churches. In support of her application, Wang submitted: (1) a certificate of baptism, (2) a church attendance certificate from the church where she was baptized, (3) photographs of Wang taken at her baptism, and (4) photographs of Wang taken at church.

Wang also submitted two affidavit letters from Liu, her sister-in-law in China. In the first letter, Liu stated that she and Wang were from the same village in the Fujian Province. In March 2010, government officers caught Liu in a house church, detained her for several days, and warned her not to attend a house church again. Moreover, the government recently had strengthened its efforts to suppress house churches. In the second letter, Liu recounted that in June 2010, three days after sending her first letter, she was again arrested for attending a house church after someone reported her for gathering church members in her home. The police asked her to name the people who attended the gathering, but she refused. The police kept her in a "separate room" and "[a]t first" did not give her food or water

3

or allow her to contact her family.  The police detained her for about two weeks until her husband and other church members paid her bail.

## B.      Hearing before IJ

At the removal hearing, Wang, represented by counsel, testified that she was from Lianjiang City in the Fujian Province.  Wang started attending Christian services in the United States after her mother became ill and a friend introduced her to the church.  At the time of the hearing, she attended a Chinese Presbyterian church in Florida.  Wang testified that she would continue to practice her religion if she returned to China by spreading the Gospel and attending an underground church.  Although public Christian churches were legal in China, she did not consider these churches "real Christian" churches because the pastors' messages must be approved by the government.  Wang feared that she would be arrested and beaten for her participation in an underground church based on Liu's arrests.

Wang also testified that her two older brothers (including Liu's husband), one older sister, her mother, and her father lived in China and attended underground churches.  Wang was not aware of any instance in which these family members had been arrested or detained for attending underground churches.

A friend of Wang and the wife of Wang's pastor both testified that Wang was a devout Christian who attended church almost every week.  The pastor's wife also testified that she and the pastor had been in the United States for eleven years,

4

and the pastor went back to China on mission trips almost every year. The pastor had never been arrested on these mission trips because the house churches were very secretive. Prior to moving to the United States, the pastor's wife practiced Christianity in China for nearly twenty years, and she had only a single incident in which she was almost arrested for spreading the Gospel.

In addition to Wang's application and the above-described testimony, the record before the IJ included letters from family members and a friend that vouched for Wang's sincere belief in Christianity and her regular attendance at church.

The record also included several annual reports on China from 2007 through 2011 by the U.S. Department of State, the Congressional-Executive Commission on China, and the China Aid Association. The reports generally indicated that the Chinese government sought to restrict religious practices to registered places of worship and to repress unregistered Protestant churches but that the restrictions on unregistered religious groups differed in degree and varied significantly from region to region. Religious repression was most severe in the Xinjiang Uyghur Autonomous Region and Tibet. However, certain parts of China, like Hong Kong, protected and respected religious freedom. One report included a list of reported persecution cases by region and province, and the Fujian Province had only one case of detention.

5

According to another report, the degree of government interference in unregistered churches ranged from minimal supervision to raids to arrests and imprisonment for unauthorized religious activity.  The reports detailed specific incidents of religious freedom restriction, including cases in which the Chinese government had shut down unregistered churches and detained or physically abused individuals, in particular church leaders, involved with unregistered churches.  Unregistered religious adherents were among those housed in high security mental hospitals where patients were forced to take medicines and subjected to shock treatment.  Activists who were in administrative detention reported that they were beaten, force-fed medications, and denied food.

The reports also reflected that, although generally the Chinese government's respect for religious freedom had declined and religious persecution had escalated in recent years, freedom to participate in religious activities had increased in several areas, underground church communities had grown over the past few decades, and religious participation had grown overall.  An estimated 50 to 70 million people practiced Christianity in unregistered churches in China.  Moreover, government officials had allowed increased space for unregistered churches that they viewed as non-threatening.  Finally, the government permitted individuals to proselytize in registered places of worship.

## C.    IJ's Order

The IJ denied Wang's application for asylum, withholding of removal, and CAT relief.  In his oral decision, the IJ concluded that Wang's asylum application was timely filed and that Wang was credible in her commitment to Christianity. However, Wang did not have a well-founded fear of future persecution based on her religion.  Furthermore, because Wang had failed to satisfy the lower burden of proof for asylum, she necessarily failed to meet the more stringent burden of proof for withholding of removal.  Finally, Wang presented no testimony that she would be tortured by or with the acquiescence of a Chinese government official, so she failed to show entitlement to CAT relief.

## D.    Appeal to BIA

Wang filed a notice of appeal to the BIA.  She argued based on the testimony and documentary evidence in the record that she had met her burdens for eligibility for asylum, withholding of removal, and CAT relief.

The BIA dismissed Wang's appeal.  Although Wang credibly demonstrated that she was a Christian, she did not have an objectively reasonable fear of persecution on account of her religion, such that she did not show entitlement to asylum.  The evidence showed widely varying interference with unregistered house churches throughout China.  Moreover, the prior arrests of Liu, Wang's sister-in-

7

law, were insufficient to show that Wang's fear of religious persecution in her home village was objectively reasonable.

Specifically, although Liu had been arrested twice, these arrests did not rise to the level of persecution, and there was no evidence that Wang would be treated more severely than Liu. Additionally, no other members of Wang's family had ever been mistreated for attending unregistered house churches. Finally, the testimony of the wife of Wang's pastor that she and her husband had never been arrested in China for their involvement in unregistered house churches undermined Wang's assertion that she would be persecuted upon her return to China.

The BIA further determined that because Wang did not meet her burden of establishing eligibility for asylum, she could not satisfy the more stringent burden of proof for withholding of removal. Finally, she was not eligible for CAT relief because she had not shown that it was more likely than not that she would be tortured by or with the acquiescence of the government.

Wang filed a timely petition for review in this Court.

## II. DISCUSSION

Our review of the decision of the BIA is highly deferential. Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004).[1] We must affirm if the

---

[1] Because the BIA's order neither expressly adopted the IJ's findings nor adopted the IJ's reasoning, we review only the BIA's order, as the final agency decision. See Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 956 (11th Cir. 2005).

decision is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 1027 (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001)). Under the substantial evidence test, we view the evidence in the light most favorable to the decision of the BIA and draw all reasonable inferences in favor of its decision. Id. We may not "reweigh the evidence from scratch," and we may reverse "only when the record compels a reversal." Id. (quotation marks omitted).

Substantial evidence supports the finding of the BIA that Wang failed to establish that she has an objectively reasonable fear of future persecution. Wang submitted evidence that her sister-in-law, Liu, had been arrested on two occasions, detained, and denied food and water "[a]t first" after her second arrest, but the record does not compel the finding that these incidents were anything more than harassment. The mistreatment of Liu is deplorable, but she did not suffer the extreme physical and mental abuse that rises to the level of persecution. Compare Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1290-91 (11th Cir. 2006) (listing decisions in which incidents of detentions, beatings, and even the deprivation of food did not constitute persecution), with Shi v. U.S. Att'y Gen., 707 F.3d 1231, 1232-33, 1236-39 (11th Cir. 2013) (finding past persecution where Chinese officials interrupted a church service to arrest petitioner and other worshippers and confiscate their bibles, and officials detained petitioner for seven days and

interrogated him twice concerning his church: during the first interrogation, officials slapped petitioner, caused him to fall to the floor by kicking his chair out from underneath him, accused him of lying, and threatened to beat him with a baton, and during the second interrogation, officials told petitioner that he had been brainwashed and that his mind had been "poisoned," and then handcuffed him to an iron bar overnight in the rain), and Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211, 1217 (11th Cir. 2007) (finding that the cumulative effect of numerous beatings, arrests, searches, and interrogations, which culminated in a fifteen-day detention with little food or water, constitutes persecution).

Wang argues that, if removed to China, she would be persecuted by having to practice Christianity in secrecy, but the record does not compel that finding. Although this Court has held that "having to practice religion underground to avoid punishment is itself a form of persecution," Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1354 (11th Cir. 2009), the evidence that Wang presented does not compel the conclusion that if she returns to China she will in fact be forced to practice her religion secretly. Wang relies on evidence in annual reports that Chinese officials have repressed religious activities and detained members of unregistered churches, but the reports also provide that local governments do not interfere with unregistered churches viewed as non-threatening; restrictions on religious freedom vary according to region; and certain areas protect religious

10

freedom.  Wang testified that her mother, father, and siblings have long attended unregistered churches in China without incident, see Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006), and only one report in the record mentioned incidents of repression in the Fujian Province.  The wife of Wang's pastor testified that she had attended underground churches in China for nearly twenty years and that her husband had traveled without incident on mission trips to China during the past eleven years.  The annual reports also provide that Christians are allowed to worship freely in registered churches.  Thus, there was substantial evidence in the record that if Wang returns to China, she may be able to practice her religion without consequence in many locations, possibly even in her hometown.  For these reasons, Wang has not demonstrated that she has a well-founded fear of future persecution.

Because Wang was unable to demonstrate a well-founded fear of persecution, the BIA properly concluded that Wang did not qualify for withholding of removal.  To state a claim for withholding of removal, an applicant must show that her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).  Because Wang failed to satisfy her burden to prove eligibility for asylum, she could not satisfy the more

11

stringent standard required for withholding of removal.  See Al Najjar, 257 F.3d at 1292-93, 1303.

Substantial evidence also supports the finding of the BIA that Wang was not entitled to CAT relief.  Wang relies on evidence in one report that religious adherents have been tortured in mental hospitals, but Wang presents no evidence to suggest that she will be singled out for such mistreatment if she returns to China. Although Liu mentioned that she had been denied food and water "[a]t first," Liu does not suggest that she was deprived of food and water for a lengthy period. Wang failed to submit evidence that would compel a conclusion that she is more likely than not to be tortured by or with the acquiescence of government officials. See Todorovic v. U.S. Att'y Gen., 621 F.3d 1318, 1324 (11th Cir. 2010).

For all of the foregoing reasons, we deny Wang's petition.

**PETITION DENIED.**

12