[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13285

_____

Agency No. A200-932-341

MIN YONG HUANG,
a.k.a. Minyong Huang,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(December 24, 2014)

Before WILSON and ROSENBAUM, Circuit Judges, and HUCK,[*] District Judge.

ROSENBAUM, Circuit Judge:

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

It's not always enough to say that you did something. Sometimes, you have to show it as well. Or at least you have to not do something else that may raise a question as to whether you did what you said you did.

In this petition, the Board of Immigration Appeals affirmed the Immigration judge's denial of Petitioner Min Yong Huang's petition for asylum, withholding of removal, and relief under the United Nations Convention Against Torture, stating that it had considered all of the "harm" that Huang suffered in China when it concluded that Huang had not been persecuted in the past on the basis of his religion. We have no doubt that the BIA believed when it wrote this conclusion that it did consider all types of harm to Huang, and, in fact, it may have done so.

But the BIA's explanation for why it reached the determination that Huang had not endured past persecution reflects only that it considered Huang's physical harm, not all forms of religious abuse that Huang suffered. So we cannot tell whether the BIA actually took into account the non-physical abuse to Huang when it rejected Huang's claim of past persecution. For this reason, this matter must be remanded to the BIA to clarify whether it considered whether Huang's non-physical harm, along with Huang's physical harm, rises to the level of "persecution," in light of our decision in *Shi v. United States Attorney General*, 707 F.3d 1231 (11th Cir. 2013), and if the BIA did not consider Huang's non-

2

physical harm, to evaluate that, along with Huang's physical harm, in determining whether Huang endured past persecution.

## I.

Where, as here, the BIA issues a decision, this Court reviews only that decision, except that we review any portion of the Immigration judge's decision that the BIA expressly adopted. *Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). We review the BIA's factual determinations under the substantial evidence test. *Id.* at 1283-84. Under this test, we must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1284 (citation and internal quotation marks omitted). We review *de novo* the BIA's interpretation of applicable statutes, and we must defer to the BIA's interpretation "if that interpretation is reasonable." *Id.* (citation and internal quotation marks omitted).

## II.

Min Yong Huang is a native and citizen of the People's Republic of China. He possesses Chinese ethnicity and asserts that he is a Christian. Huang, who claims that he originally entered the United States on October 20, 2009, filed an application for asylum, withholding of removal, or relief under the United Nations Convention Against Torture ("CAT") on the basis that he would be persecuted for

3

being a practicing Christian if he were returned to China. An asylum officer declined to grant the application and referred it to the Immigration Court.

On January 13, 2011, the government issued a "Notice to Appear," charging Huang with removability under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. Through counsel and written pleadings, Huang admitted the factual allegations set forth in the Notice to Appear and conceded his removability, but he renewed his asylum application, claiming persecution based on his Christian faith.

A.    December 27, 2011, Hearing Before the Immigration Judge

An Immigration judge ("IJ") held a hearing on December 27, 2011, at which Huang testified. Huang stated that he left China because he suffered persecution based on his belief in Christianity. He testified that a friend introduced him to Christianity in 2006 and that he went to church every Sunday in a rural area of China.

According to Huang, on Sunday, August 23, 2009, while he attended church, police stormed in and arrested him and approximately fourteen to fifteen others. About ten people, including the pastor, managed to escape.

Huang testified that after his arrest, police took him to the police station, where he was locked up and detained with the other church members for three days. During Huang's detention, Huang claimed, the police asked him for the

4

names of the other church members and the pastor, who had evaded capture. When Huang did not comply with their requests for information, the police beat Huang in the chest and abdomen with a baton wrapped with leather. Huang claimed that he suffered bruises over his body as a result of the beating.

After three days, Huang recounted, his father bailed him out of jail. But at the time of Huang's release, the police asked Huang to sign a statement vowing not to attend his church again. Huang signed the letter promising not to continue to participate or attend underground church activities. According to Huang, his father then took him to a hospital in Fuzhou City to have his injuries assessed. At the hospital, a doctor noted bruising on Huang's body, gave him medication, told him to rest, and released him from the hospital the same day. Huang returned to the hospital at a later date for a follow-up appointment.

Huang also testified that he later went back to his church, finding that everything inside had been destroyed. When he returned to his house, Huang saw a police car and observed police inside his home. According to Huang, he hid across the street before returning home. Once at home, Huang spoke to his father, who was present while the police were there. Huang's father told him that the police asked for Huang to return to the police station for further investigation. Huang found that his religious materials, including his bibles, had been confiscated by the police.

5

As a result of these incidents, Huang decided that he had to leave China because he feared that he would be arrested again if he continued to practice Christianity. In order to accomplish this goal, Huang's father brought Huang to Fuzhou City, where the two stayed in a motel from August 30-31, 2009. They later traveled to another small hotel in a rural area, where Huang stayed until September 7, 2009. Huang arrived in Shenzhen on September 8, 2009, and then left for Hong Kong. According to Huang, he traveled through France, Columbia, Cuba, and Mexico before finally making it to the United States. Huang further explained that he crossed the United States-Mexican border on October 20, 2009.

Huang stated that he feared that he would be persecuted if he were to return to China and testified that his father told him that after Huang left the country, the police had visited his father's home inquiring about Huang's whereabouts. According to Huang, the police also told his father that Huang was required to report back to the police station when he returned to China. A letter authored by Huang's father and presented during the hearing corroborates this testimony, although the letter indicates that after November 2009, police visited Huang's father's home less frequently. Finally, Huang testified that if he were required to return to China, he would not attend a government-approved church but instead would continue to go to an underground church.

6

B.    The IJ's Determination

At the conclusion of the proceedings, the IJ announced his decision, denying Huang's application for relief and finding Huang removable as charged.  The IJ did not make a credibility determination with respect to Huang but nonetheless found that Huang had failed to demonstrate either past persecution or a well-founded fear of future persecution based on his religious beliefs and that he was not entitled to asylum.  The IJ also denied Huang's request for withholding of removal and his CAT claim, and he ordered Huang to be removed to China.

C.    Huang's Appeal to the BIA and Subsequent Appeal to this Court

Huang timely filed an appeal from the IJ's decision to the BIA.  Among other issues Huang raised, Huang argued that he had established that he was eligible for asylum and withholding of removal under the particular facts of his case.

On June 21, 2013, the BIA upheld the IJ's decision and dismissed Huang's appeal.  First noting that the IJ did not make an explicit adverse credibility finding, the BIA determined that an unrebutted presumption of credibility in favor of Huang existed on appeal.  Nevertheless, the BIA concluded that the IJ had correctly determined that the "injuries" sustained by Huang, "considered cumulatively, did not rise to the level of severity to constitute past persecution." *Id.* at 2.  The BIA also agreed with the IJ that Huang had not demonstrated a well-

7

founded fear of future persecution in China based upon the facts presented. As a result, the BIA concluded, Huang also had failed to meet the standard of "clear probability" of persecution required for withholding of removal. Accordingly, the BIA denied relief to Huang.

## III.

In his petition, Huang contends that the BIA abused its discretion by failing to consider the cumulative effects of his experience in China, asserting that the BIA instead took into account only Huang's physical injuries, when the BIA concluded that Huang had not suffered past religious persecution. Because, based on the record, we cannot determine whether, in reaching its conclusion, the BIA accounted for all of the types of abuse Huang suffered, we remand to the BIA for further consideration in light of this opinion.[1]

A petitioner may apply for a discretionary grant of asylum if he is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [the country of the person's nationality, or in the case of a person having no nationality, the country in which the person last habitually resided,] because of persecution or a well-founded fear of persecution on account of race,

---

[1] Huang also argues that the BIA erred when it determined that Huang had not demonstrated that he would suffer future religious persecution. Huang would be entitled to a presumption of future religious persecution if he established past persecution. 8 C.F.R. § 208.13(b)(1). Because the BIA's determination regarding whether Huang suffered past persecution may influence the analysis of whether the BIA erred when it determined that Huang had not demonstrated that he would suffer future religious persecution, we do not reach this issue.

religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1)(A) (incorporating the definition of "refugee" set forth at 8 U.S.C. § 1101(a)(42)(A)).  The petitioner bears the burden of proving his refugee status.  *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1290 (11th Cir. 2006) (per curiam); *see also* 8 C.F.R. § 208.13(a).  A petitioner can show that he is eligible for asylum by demonstrating one of two things: (1) past persecution on account of one of the five statutorily protected grounds or (2) a well-founded fear that one of the five protected grounds will cause future persecution.  8 C.F.R. § 208.13(b).

Persecution is an "extreme concept that does not include every sort of treatment that our society regards as offensive."  *Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1235 (11th Cir. 2013) (citation and internal quotation marks omitted).  We have noted that persecution based on a listed statutory category requires "more than a few isolated incidents of verbal harassment or intimidation."  *Id.* (quoting *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000) (internal quotation marks omitted).  The Court evaluates the harms that a petitioner has suffered cumulatively and considers the totality of the circumstances on a case-by-case basis. *Id.*

The BIA assumed Huang's credibility but denied his applications for asylum and withholding of removal because it determined that "the injuries [that Huang]

9

suffered in China, considered cumulatively, did not rise to the level of severity to constitute past persecution." As the BIA viewed the evidence, "[w]hat [was] relevant [was] the severity of the beatings, and neither [Huang's] testimony nor his documentary evidence establish[ed] that the beatings were so severe that he sustained serious injuries, considered along with his other harm, sufficient to rise to the level of persecution . . . ." In support of this analysis, the BIA cited only *Djonda v. U.S. Attorney General*, 514 F.3d 1168 (11th Cir. 2008), and *Delgado v. U.S. Attorney General*, 487 F.3d 855 (11th Cir. 2007) (per curiam).[2]

But *Djonda* and *Delgado* involved claims of persecution based on political opinions and activities only; they did not concern claims of persecution based on religious beliefs and practices. While we do not suggest that one type of persecution is worse than another or that cases involving one type of persecution cannot be instructive in evaluating claims of the other type of persecution, the nature of each type of persecution differs. And some persecutory activities common to one type of persecution do not occur and do not have a comparable analogue in the other type of persecution. So, when relying on political-

---

[2] The BIA's decision referenced the IJ's decision, which mentioned that Huang's "Christian materials" were confiscated but did not appear to attach any significance to this fact. In any case, the BIA's decision appears to have relied exclusively on the physical aspects of the abuse to Huang. For example, the decision summarizes *Djonda* as "finding that detention for 36 hours, and beatings resulting in scratches and multiple muscle bruises but no more serious injuries, did not constitute past persecution" and summarizes *Delgado* as "finding that threats and severe beatings did not constitute persecution." The decision cites no other cases and provides no other analysis other than that indicated above regarding past persecution.

10

persecution cases to evaluate claims of religious persecution, we must ensure that, in addition to comparing common persecutory activities of each type of persecution, we also consider relevant persecutory activities that are unique to religious persecution. But from the BIA's explanation for denying Huang's claims of past religious persecution, we cannot ascertain whether the BIA in fact considered all of the forms of religious abuse that Huang endured.

In both *Djonda* and *Delgado*, the two political-persecution cases on which the BIA relied in rejecting Huang's claim of past persecution, the petitioners were physically threatened and abused, like Huang was here. But unlike the *Djonda* and *Delgado* petitioners, who did not allege religious persecution, Huang asserted that he suffered other forms of abuse as well. In particular, Huang complained that the religious service he attended was broken up and he was arrested for attending it;[3] he was detained when he would not provide the names of his fellow worshipers and his pastor; upon his release from detention, he was required to sign a statement vowing not to attend his church again; his church was destroyed; and his religious materials, including his bibles, were confiscated.

---

[3] Djonda was arrested for attending a meeting of an organization sympathetic to the opposition political party. That meeting, while just as entitled to be free of persecution as a religious service, was different in nature from the peaceable, non-political religious service that Huang was arrested for attending, so the harm that Djonda suffered differed in nature from the harm that Huang endured. *Cf. Shi*, 707 F.3d at 1236 ("There is no evidence in the record that [the petitioner] and his family['s] [private home church service were] targeted because [the petitioner and his family] had engaged in protests of religious oppression in China that would have drawn the Chinese authorities' attention to the group's . . . meeting. In fact, the record demonstrates quite the opposite: the police described the religious meeting itself as 'illegal.'").

11

We have previously found these forms of abuse to be highly relevant in determining whether a person has suffered religious persecution. As we have explained, "since its founding the United States has abhorred the notion that governments may constrain a citizen's right 'to practice one's faith,' let alone break up a church meeting, seize religious materials, and incarcerate all of the worshippers." *Shi*, 707 F.3d at 1236 (quoting *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1358 (11th Cir. 2009) (Marcus, J., concurring)).

*Shi* involved a Chinese national who attended Christian services at a "home church," when police broke up the event and arrested the ten worshippers, including Shi. *Id.* The police confiscated the congregants' bibles and referred to the service as an "illegal meeting." *Id.* After Shi was taken to the police station, he was searched, booked, and interrogated multiple times. *Id.* During the first interrogation, a police officer slapped Shi in the face, kicked a chair out from underneath him, and threatened to beat him with a baton. *Id* at 1233. Following four days of detention, police again interrogated Shi, and, when Shi refused to respond, police took him outside and handcuffed him to an iron bar located at the back of the police station. *Id.* Shi was left outside in the rain, chained to the bar for the night. *Id.* The following morning, the police removed the restraints, but Shi became ill with a high fever and a sore throat. *Id.* According to Shi, the police feared that he would die in custody, so they released him to his mother. *Id.* Before

releasing him, however, the police directed Shi to write a letter promising to forego participating in future meetings. *Id.*

On these facts, we determined that the conduct involved constituted an "extreme and egregious suppression of religious practice." *Id.* at 1235. In reaching this conclusion, we emphasized four circumstances in particular. First, we said that the fact that "the incident began with the interruption of a private church service and ended with an attempt to coerce Shi to abandon his religious convictions and to promise to never again attend a church meeting like the one that led to his detention in the first place" "strongly cut[] in favor of finding persecution." *Id.* at 1236. Second, we found especially disturbing the police confiscation of Shi's religious group's bibles. *Id.* at 1237. When we discussed this factor, we compared Shi's case to the case of *Jiang v.* Gonzales, 485 F.3d 997 (7th Cir. 2007), and adopted and quoted the Seventh Circuit's observation that this type of harm is significant in its own right:

> "In concluding that that Jiang had not suffered past persecution, the IJ erroneously focused only on Jiang's detention and beating" and denied that those harms rose to the level of persecution. . . . However, "[t]he IJ failed to consider the entire sequence of experiences that Jiang underwent. . . . [Jiang] was prohibited from attending church, th[e] police illegally searched his home, . . . confiscated his religious materials, and . . . continued to track his whereabouts after his release by requiring him to check in weekly."

13

*Shi*, 707 F.3d at 1237 (quoting *Jiang*, 485 F.3d at 997) (alterations made by *Shi* Court).  As for the third and fourth considerations, we noted that Shi had been detained for seven days, which we found significant, and that he had been handcuffed to an iron bar overnight in the rain.  *Id.*

While Huang was not detained for seven days and was not handcuffed to an iron bar overnight in the rain, the incident involving Huang, like the one involving Shi, "began with the interruption of a private church service and ended with an attempt to coerce [Huang] to abandon his religious convictions and to promise to never again attend a church meeting like the one that led to his detention in the first place."  *See Shi*, 707 F.3d at 1236.  And, just as Shi's religious group's bibles were confiscated, Huang's religious materials, including his bibles, were confiscated by the police.  Beyond these actions, the police destroyed everything inside Huang's church.  Huang was also detained for three days and was beaten when he refused to provide the names of his escaped fellow worshipers and pastor.  Finally, similar to the facts in *Jiang*, if Huang returns to China, he is required to check in with the police, and police have returned to Huang's house looking for him since he departed China.

We do not opine on whether Huang's circumstances demonstrate past persecution.  But we cannot tell from the BIA's explanation of why it denied Huang's claim of past persecution—an explanation rooted in the BIA's perception

14

of the level of severity of the physical abuse to Huang—whether the BIA considered the types of religious abuse that we found to be highly relevant in *Shi* when it evaluated Huang's petition.  Although the BIA need not "write an exegesis on every contention[,]" *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992) (quoting *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987)) (internal quotation marks omitted), it must nonetheless "consider the issues raised [by the applicant] and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (quoting *Vergara-Molina*, 956 F.2d at 685 (quoting *Becerra-Jimenez*, 829 F.2d at 1000)).  Error occurs if the BIA "fails to weigh important factors . . . ." *Id.*  Here, because we cannot ascertain from the BIA's decision whether the BIA considered the types of abuse unique to religious persecution when it denied Huang's claim of past persecution, we remand this matter to the BIA for further proceedings consistent with this opinion.

     **VACATED** and **REMANDED** for further proceedings.