[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14332
Non-Argument Calendar
_____

Agency No. A209-339-475


IRFAN ALI,

                                                                    Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                                    Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(August 5, 2019)

Before TJOFLAT, ROSENBAUM, and JULIE CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

The petitioner in this case asks us to review the Board of Immigration

Appeals's (the "Board's") denial of his asylum, withholding-of-removal, and

Convention Against Torture ("CAT") claims.  To effectively conduct our review, we must be left with the conviction, based on the record before us, that the Board has considered and reasoned through the most relevant evidence of the case. Because the Board has not left us with that conviction here, we grant the petition for review, vacate the Board's decision, and remand the case to the Board for further consideration.

## I.

Petitioner Irfan Ali is a Pakistani Ahmadi—that is, a practitioner of Ahmadiyya Islam.[1]  The Department of Homeland Security initiated removal proceedings against Ali on the grounds that he entered the United States without a valid entry document and without being admitted or paroled by an immigration officer.  During those proceedings, Ali sought asylum and withholding-of-removal relief under the Immigration and Nationality Act (the "INA"), as well as relief under the CAT.  *See* 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16.

The INA authorizes the Attorney General to grant asylum to any alien determined to be a "refugee" as defined by the statute.  8 U.S.C § 1158(b)(1)(A). Under the statute, a "refugee" is "one who is unable or unwilling to return to his or

---

[1] The principal difference between Ahmadiyya Islam and Sunnism, the Muslim majority sect, centers on the identity of the reformer that the Prophet Muhammad foretold would appear after him.

2

her home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

To make out an asylum claim, an applicant must establish either past persecution or a well-founded fear of future persecution. *Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1231 (11th Cir. 2018); 8 C.F.R. § 208.13(b). This second basis for relief can be met either by coming forth with applicant-specific evidence or by showing, broadly speaking, the applicant's affiliation with a group that is subject to a "pattern or practice" of persecution (otherwise known as group persecution). 8 C.F.R. § 208.13(b)(2)(iii). In all cases, the persecution must be "'by government forces' or 'by non-government groups that the government cannot control.'" *Sama*, 887 F.3d at 1231−32 (quoting *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010)).

Ali alleged past persecution and a well-founded fear of future persecution, both individually and as a member of a group: He himself was forced to worship in secret when he lived in Pakistan, and all Pakistani Ahmadis must hide their religious practice because they face violence and because open worship of the

3

religion is criminal.[2]  The Immigration Judge ("IJ") rejected each claim, and Ali appealed the decision to the Board.[3]

The Board dismissed Ali's appeal on the asylum claim.  Because he was able to regularly attend his mosque and to serve as a youth organizer for Ahmadis in his community, the Board found insufficient evidence of past persecution. Basing its decision largely on the same evidence, the Board likewise found insufficient evidence of a well-founded fear of future persecution.  To be sure, it acknowledged some contrary evidence in the record, particularly as it related to Ali's group-persecution claim.  It found, for example, that Pakistani Ahmadis may not refer to themselves as Muslims or to their places of worship as mosques and may not sell their religious literature.  It also found that they are victims of both blasphemy accusations and violence.  Nonetheless, the Board pointed to efforts by the Pakistani state to protect Ahmadis from both.  So considering these efforts,

---

[2] The Government asserts that Ali has waived his group-persecution claim by failing to brief the issue on appeal.  We disagree.  Proceeding *pro se*, Ali argues that Ahmadis face harsh circumstances in Pakistan, that they cannot worship openly in the country, and that they must hide themselves "in every aspect of life" because their practices violate the Pakistani constitution and criminal code.  This argument is enough for us to evaluate his group-persecution claim.  *Cf. Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.").

[3] We do not summarize the IJ's findings of fact or conclusions of law because when assessing a petition for review, we review only the Board's decision, except to the extent it "expressly adopts" the IJ's opinion.  *Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001).  Here, we review only the Board's decision because the Board independently analyzed the IJ's decision in a four-page opinion.

4

alongside the fact that Pakistani law guarantees the free exercise of religion, as well as the fact that Ali practiced his religion, the Board rejected Ali's asylum claim. Because withholding of removal has a stricter evidentiary standard than asylum,[4] the Board rejected that claim, too. And because Ali did not appeal his CAT claim, the Board deemed it waived.[5]

In his brief to the Board, however, Ali flagged specific evidence, ignored by the IJ, that contradicted the IJ's decision to deny him asylum and withholding-of-removal relief. We discuss that evidence in broad strokes now but reserve the details for our analysis. *See infra* Part III. For example, though Ali was able to attend his mosque for a while, that mosque was eventually shut down due to threats of violence against its attendants that went unaddressed by the police. Once the mosque was closed, "he was no longer able to pray there and instead had to pray in secret outside of town." The IJ's decision was therefore problematic, Ali argued, because our cases recognize that "being forced to practice one's faith in secret

---

[4] *Compare* 5 C.F.R. § 208.13 (imposing a "credible fear" standard for asylum), *with id.* § 208.16(b)(2) (imposing a "more likely than not" standard for withholding of removal); *see also Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1177 (11th Cir. 2008) (stating that withholding of removal is a "higher standard").

[5] So do we. We have jurisdiction to review final orders of the Board only when an alien has exhausted "all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). And "when a petitioner has neglected to assert an error before the [Board] that he later attempts to raise before us, the petitioner has failed to exhaust his administrative remedies." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016) (citation omitted). Having reviewed Ali's brief, we conclude, as did the Board, that Ali did not raise his CAT claim on appeal. We thus lack jurisdiction to consider it here.

amounts to persecution."  Similarly, though the Board echoed the IJ's finding that Pakistani Ahmadis were constitutionally protected, Ali argued that they were "excluded from these alleged constitutional 'guarantees.'"  He then cited specific examples that supported his position, including Ahmadis' inability to openly practice their religion, to propagate their religion, to convene for religious gatherings, to perform a pilgrimage, to vote, to build mosques, and to pray in certain manners.

In summary, the IJ ignored specific evidence that Ali brought to its attention, and on appeal, the Board ignored that same evidence.  Ali now petitions us to review the Board's decision.

## II.

To enable our review, the Board must "give 'reasoned consideration'" to an applicant's claims and "make 'adequate findings.'"  *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (quoting *Morales v. INS*, 208 F.3d 323, 328 (1st Cir. 2000)).  We assess the Board's compliance with this mandate through something our cases have come to call a reasoned-consideration examination.  *See, e.g.*, *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 874 (11th Cir. 2018).  Whether the Board has afforded a petition reasoned consideration is a question we

6

review *de novo*.[6]  *Id.*  Because the reasoned-consideration requirement has

garnered significant attention in our recent cases,[7] we take a moment to explain it.

Though we review the Board's legal conclusions *de novo* and its factual

findings for substantial evidence, *Sama*, 887 F.3d at 1231, we are sometimes

prevented from performing that review in the first place.  This is so because our

review of the Board's decisions operates on a simple premise: The Board has

reached a decision only after having evaluated the entire evidentiary record.  When

the Board has not convinced us that it has done so, as is the case when we remand

for a lack of reasoned consideration, we hold that the decision is incapable of

review and thus do not proceed to analyze the Board's legal or factual conclusions.

Thus,

> when we remand for lack of reasoned consideration, it is not because
> we have reviewed [the Board's] decision and disagreed with its legal
> conclusions and factual findings.  Rather, we have determined that,
> *given the facts and claims in the specific case before the IJ and the*
> *[Board]*, the agency decision is so fundamentally incomplete that a
> review of legal and factual determinations would be quixotic.

*Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1302 (11th Cir. 2015) (citation

omitted).

---

[6] On finding a lack of reasoned consideration, we grant the petition for review, vacate the Board's decision, and remand the case for further proceedings.  *Jeune*, 810 F.3d at 803.

[7] *See Bing Quan Lin*, 881 F.3d at 874; *Jeune*, 810 F.3d at 803; *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1302 (11th Cir. 2015); *Min Yong Huang v. Holder*, 774 F.3d 1342, 1349 (11th Cir. 2014).

To generate grounds for reviewability in this Court, the Board does not need to do much.  We just need to be left with the conviction that the Board "has heard and thought [about the case] and not merely reacted."  *Min Yong Huang v. Holder*, 774 F.3d 1342, 1349 (11th Cir. 2014) (alteration adopted) (quoting *Tan*, 446 F.3d at 1374); *see also Bing Quan Lin*, 881 F.3d at 874 ("What is central to a showing of reasoned consideration is that the reasoning of the [IJ] and the [Board] is logical and can be reviewed for error.").  For this reason, we have repeatedly emphasized that although the Board "must consider all the evidence submitted," *Indrawati*, 779 F.3d at 1302, it "need not address specifically . . . each piece of evidence the petitioner presented," *id.* (quoting *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 534 (11th Cir. 2013)).

We have sustained reasoned-consideration claims in three types of circumstances: when the Board "misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record."  *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016).  The first of these three circumstances, involving the "contents of the record," clearly relates to the evidence amassed before the Board, but so do the other two circumstances.  Indeed, the failure both to explain the rejection of logical conclusions and to provide reasonable justifications for decisions each flow from

8

some irreconcilable tension between the opinion and the record evidence.  All failures to give reasoned consideration thus share a common trait: The Board's opinion, read alongside the evidentiary record, forces us to doubt whether we and the Board are, in substance, looking at the same case.

We emphasize today—just as we have in the past—that to write a reviewable decision, the Board does not need to discuss all record evidence.  In some cases, however, it is practically impossible for the Board to write a reviewable decision without discussing "highly relevant" evidence.  *See Min Yong Huang*, 774 F.3d at 1349.  In simplest terms, this situation arises when the record would compel a different outcome, absent the discussion of certain evidence.  *Cf. Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1234 (11th Cir. 2013) (stating that we reverse on substantial-evidence review when the record "compels" a conclusion contrary to that reached by the Board (quoting *Imelda v. U.S. Att'y Gen.*, 611 F.3d 724, 728 (11th Cir. 2010))).  So unless the Board discusses that evidence, the Board "fails to adequately explain its rejection of logical conclusions," thus rendering the decision incapable of review.  *See Jeune*, 810 F.3d at 803.

With that standard in mind, we turn to the Board's assessment of Ali's religious-persecution claims.

9

III.

Persecution, we have said, is an "extreme concept that does not include every sort of treatment that our society regards as offensive." *Min Yong Huang*, 774 F.3d at 1346−47 (quoting *Shi*, 707 F.3d at 1235). We have noted that it requires "more than a few isolated incidents of verbal harassment or intimidation." *Id.* at 1347 (quoting *Shi*, 707 F.3d at 1235). And we have explained that it must be evaluated "cumulatively." *Id.* At the end of the day, however, what constitutes persecution is determined by the "totality of the circumstances on a case-by-case basis." *Id.* Though this standard might want for clarity, a core principle animates our religious-persecution cases: An applicant is a victim of religious persecution when he cannot practice his religion openly. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009) ("[H]aving to practice religion underground to avoid punishment is itself a form of persecution." (citing *Muhur v. Ashcroft*, 355 F.3d 958, 960–61 (7th Cir. 2004) (Posner, J.))).

The Board assures us that Ali's treatment, and that of Ahmadis in Pakistan generally, is "harassment, not persecution." It supports its denial of Ali's claims with two overarching findings: (1) Pakistani law guarantees the free exercise of religion, and (2) Ali himself freely practiced Ahmadiyya Islam when he was still living in Pakistan. This reasoning falters in light of the record, however, which seems to "compel[]" a contrary conclusion. *See Shi*, 707 F.3d at 1234 (quoting

10

*Imelda*, 611 F.3d at 728). Because the Board has not discussed "highly relevant" evidence, however, *see Min Yong Huang*, 774 F.3d at 1349, we cannot yet conduct substantial-evidence review.

The Board determined that "Pakistani law guarantees the right to the free exercise of religion and allows for the profession and practice of one's faith." But this conclusion is illogical in light of the record. The record contains significant evidence that (1) contrary to the Board's finding, *de jure* persecution *does* exist and (2) even if it did not, *de facto* persecution does. For example, though Pakistan's constitution provides that "every citizen shall have the right to profess, practice, and propagate his religion," its penal code bans Ahmadis from preaching or propagating their religious beliefs. Even if there were no inconsistencies in the laws, moreover, the record is replete with evidence that undercuts any nominal guarantee of religious freedom.

Take as just one obvious example blasphemy. The record indicates that Pakistan's anti-blasphemy laws prohibit Ahmadis from professing core tenets of their faith by making it a crime to defile the Prophet Muhammad and by interpreting a central tenet of the Ahmadi faith as doing so.[8] In fact, the record suggests that both the Pakistani state and the public use the anti-blasphemy laws to

---

[8] In Pakistan, "defiling Prophet Muhammad" can earn you the death sentence, and "defiling, damaging, or desecrating the Quran" can earn you life imprisonment.

specifically target, harass, and abuse Ahmadis: Though Ahmadis constitute less than five percent of the population, they represent nearly forty percent of those arrested for blasphemy.

That's hardly all. Look at this evidence that gets not one iota of treatment in the Board's opinion:

- The Pakistani state interferes with Ahmadi places of worship. The state has "seal[ed] or demolish[ed] Ahmadiyya mosques, barred construction of new mosques, and [taken] no action to prevent or punish assailants who demolished, damaged, forcibly occupied[,] or set Ahmadiyya mosques on fire." Ali, whose credibility the Board affirmed, testified that even within the mosques, Arabic verses were not permitted to be written on the walls and that the police would remove those writings when they were present.

- The Pakistani state interferes with Ahmadi religious texts. The "publication of religious texts" and "importation of sacred books" is permitted—"except for Ahmadis." Ali testified that Ahmadis were not permitted to carry or to recite from the Quran.

- The Pakistani state interferes with an Ahmadi pilgrimage. Ali testified that the Hajj is a "very important pillar of Islam for any Muslim." But Ahmadis were unable to complete the Hajj because securing a passport requires an applicant "to list religious affiliation and denounce the Ahmadiyya prophet."

- The Pakistani state imposes penal violations on Ahmadis for preaching or proselytizing their religious beliefs. Ali testified, moreover, that preaching is "part of [Ahmadis'] religion."

- The Pakistani state's treatment of Ahmadis carries over to the polling place. Ahmadis are "kept on a separate voter list" and "physically intimidated while trying to vote."

12

The Board merely states that "Ahmadiyya Muslims are prohibited from identifying themselves as Muslims, from referring to their places of worship as mosques, and from selling Ahmadiyya literature, among other things." Here's the problem: We expect the Board to "list[] the basic facts of the case." *See Bing Quan Lin*, 881 F.3d at 874. The Board's failure to mention *any* of these five pieces of "highly relevant" evidence, *see Min Yong Huang*, 774 F.3d at 1349, undermines our belief that it "has heard and thought and not merely reacted," *id.* (quoting *Tan*, 446 F.3d at 1374 (alteration adopted)).[9] More specifically, when the Board fails to explain why interference with place of worship, text of worship, ritual of worship, and tenets of worship does not rise to the level of persecution, it "fails to adequately explain its rejection of logical conclusions." *See Jeune*, 810 F.3d at 803.

The Board also rested its decision on the fact that, putting Pakistani law aside, Ali while living in Pakistan "was able to freely practice his religion." Yet this conclusion, too, is illogical in light of the record. The Board reasoned that Ali attended mosque and served as a youth organizer, a role through which he taught young community members about the faith. But it wholly ignored Ali's own

---

[9] Because the Board need not "write an exegesis on every contention," *Min Yong Huang*, 774 F.3d at 1349 (alteration adopted) (quoting *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992)), we do not raise all record evidence that the Board failed to address. So we suggest neither that this evidence is the only evidence that might compel a conclusion contrary to the Board's decision nor that no other record evidence supports the Board's decision.

13

testimony—testimony the IJ found to be credible and testimony the Board did not discredit.

Ali testified that after converting, he kept his religion a secret for years and that it was difficult to practice his faith because Ahmadis were forced to pray "in hiding" in a "secret place" that was "away from the public eye." Other Muslims would kill Ahmadis if they practiced in public, and due to threats against the community, Ahmadi women and children could not attend their mosques. For example, the mosque Ali regularly attended faced security threats, and in his youth-organizing capacity, he was responsible for creating a security plan to protect the group's members. In line with that plan, the members would divide into groups of ten to twelve and pray inside different houses, while several other members acted as lookouts. Alternatively, they would pray in hiding at a member's farm outside the city. Considering this testimony, the Board's conclusion that Ali does not have a religious-persecution claim is downright befuddling. After all, "having to practice religion underground to avoid punishment is itself a form of persecution," *Kazemzadeh*, 577 F.3d at 1354, and the "logical conclusion[]" is that Ali was forced to do just that, *see Jeune*, 810 F.3d at 803.

All in all, the Board's opinion in this case is a classic example of a decision that is incapable of review due to a lack of reasoned consideration. Its failure to

14

discuss "highly relevant" evidence, *see Min Yong Huang*, 774 F.3d at 1349, leads to illogical conclusions—ones that cast doubt on whether the Board considered that evidence in the first place.  For this reason, we grant Ali's petition for review, vacate the Board's decision, and remand the case for further proceedings.

This evidence does not compel a finding of persecution, though the Board is certainly free to conclude as much on remand.  But the evidence must be wrestled with.  The Board can explain why it accords certain highly relevant evidence less weight than other evidence—or why it discredits that evidence altogether.  Or it can explain why the evidence does not meet the legal standard of religious persecution.  In conclusion, the Board wields wide discretion on how to proceed on remand, and we today express no opinion on the merits.  We simply hold that the Board's decision, read alongside the record, considered alongside our religious-persecution cases, is so puzzling that we cannot be sure the Board afforded Ali the consideration of his claims that the law requires.

## IV.

Because the Board has not afforded this case reasoned consideration, and because we will not substitute our own reasoning for that of the Board, we **GRANT** Ali's petition for review, **VACATE** the Board's decision, and **REMAND** the case to the Board for further consideration of Ali's asylum and withholding-of-removal claims.

15