[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14116
Non-Argument Calendar

_____

Agency No. A216-123-987

ANNA GODIEVA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 3, 2020)

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Anna Godieva, a native and citizen of Belarus, petitions for review of the

Board of Immigration Appeals ("BIA") order affirming the Immigration Judge's

("IJ") denial of asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").  After careful review, we deny her petition.

## I.

Godieva entered the United States in November 2017 as a non-immigrant visitor with authorization to remain until May 9, 2018.  In December 2018, after Godieva's application to extend her period of authorized presence was denied, the Department of Homeland Security served Godieva with a Notice to Appear, charging her with removability under 8 U.S.C. § 1227(a)(1)(B) for remaining in the United States without authorization.

Through counsel, Godieva applied for asylum, withholding of removal, and CAT relief.  Along with her applications, she submitted a detailed affidavit as well as other documentation.  Godieva claimed that she had been persecuted on account of her anticorruption political opinion and that she had a well-founded fear of persecution and torture if returned to Belarus.  Godieva explained that, before fleeing to the United States, she had worked as an accountant for an influential businessman with connections to the Belarus government and the KGB.  When Godieva attempted to quit rather than help him commit fraud, the businessman physically harmed her and threatened her with death, accused her of stealing from him, and then orchestrated a criminal prosecution against her.

Before the merits hearing in March 2019, she submitted additional documentation, which included, among other things, the following: (a) a letter from Amnesty International to the IJ stating that Godieva could be "subject to arrest, detention, and/or torture, and ultimately an unfair trial" if returned to Belarus; (b) an Interpol "Red Notice" issued at the request of Belarus stating that Godieva was a fugitive wanted for prosecution for misappropriating approximately $145,000 from companies owned by the businessman; and (c) an expert report prepared by Ralph Scott Clem, Ph.D., a professor at Florida International University, who wrote that Godieva's claims were plausible because Belarus was a "highly corrupt" and "human rights abusive state[]" "in which some of its citizens are beaten, imprisoned, and tortured by agents of the state," and that it used Red Notices to go after "those that it regards as a threat to its corrupted authoritarian rule."

## A.

At the merits hearing, Godieva testified through an interpreter as follows. Godieva was a professional accountant in Belarus. In August 2015, her father introduced her to an acquaintance, Vladimir Shvedov, an influential businessman who was looking for a chief accountant for his companies, Skeron and Royal Dom, which produced and distributed cleaning supplies. She began working for him in October 2015 and signed an employment agreement one month later.

Godieva started having problems with Shvedov in November 2016. Shvedov wanted to restructure Royal Dom into a new company, Royal Dom Group, and he asked Godieva to falsify certain accounting reports about Royal Dom's status. Godieva refused and stopped going to work. Shvedov ultimately called her to say he would agree to submit accurate accounting reports.

Then, in early 2017, Godieva objected that Shvedov could not use a piece of land for the purpose he intended without having the land rezoned and paying higher taxes. Shvedov told Godieva to mind her own business, and he proceeded with his plans. A tax declaration for that land was due in July 2017. Instead of filing a false tax declaration, as Shvedov had demanded, Godieva chose to resign.

On July 20, 2017, Godieva arrived at Skeron's offices to terminate her employment agreement. When Shvedov saw her, he ran up and grabbed her bag, taking her wallet, phone, and passport. Pushing her into his office, he locked the door and held her captive for six hours. During that time, Shvedov beat her up, refused to permit her to drink water or use the restroom, pulled her around the office by her blouse, threatened to bury her in the woods, and accused her of owing him the equivalent of $128,000. He released her only after she signed a note stating that she had stolen the money from him. Godieva believed that Shvedov wanted "a guarantee that I would not talk about the violations which he had committed." Godieva reported these events to the Minsk's prosecutor's office in October 2017.

4

On August 7, 2017, employees of the Department of Financial Investigation came to her house to investigate Shvedov's complaint that she had stolen $128,000 from him.   Godieva denied stealing any money and gave them supporting documents, which showed, among other things, that Shvedov had paid her the equivalent of $144,000 for her work.  The investigators seized the documents and her personal computer and then brought her to the Department.

Once at the Department, Godieva told an investigator about how Shvedov had obtained the signed note from her and about violations in Shvedov's companies.  The investigator told her that she was a thief and that she would be jailed, beaten up, and tortured if she continued to complain of Shvedov's illegal activities.  He stated that he had jailed other accountants who had complained about their directors.  The investigator also showed her falsified addenda to her employment agreements. Godieva went home after she was denied copies of the seized documents.

Godieva left Belarus for the United States, where her mother lived, on November 18, 2017, five days after her father died.

After cross examination, the IJ questioned Godieva about various matters. Godieva told the IJ that she was able to sell her house in Belarus before leaving for the United States, though she noted that Shvedov had tried to force her to transfer ownership of the house to him.  The IJ stated, "You didn't tell us about that before." Godieva replied that it was in her written statement.  According to that statement,

she met with Shvedov on July 21 to retrieve her passport, which he had kept after taking it the day before. Before returning the passport, Shvedov demanded that Godieva sign over her house to him, and then, when she refused, sought to have her sign an agreement before a notary stating that Shvedov had loaned her the $128,000. Godieva refused to sign these documents and was eventually able to obtain her passport through the notary. When the IJ asked Godieva why she did not mention these facts in her testimony, she said she was nervous and simply forgot.

**B.**

In a written decision denying Godieva relief and ordering her removed to Belarus, the IJ first found that she lacked credibility and that her corroborating evidence failed to rehabilitate her credibility. The IJ found that Godieva's testimony was vague, occasionally implausible, and contained inconsistencies and omissions.

Turning to the merits of her claims, the IJ determined that the events Godieva described failed to establish that she had suffered past persecution or possessed a well-founded fear of future persecution. The IJ further found that Godieva failed to establish that the alleged persecution was on account of a protected ground. Because she failed to meet the lower standard for asylum, the IJ found that she did not establish eligibility for withholding. As to the application for CAT protection, the IJ determined that Godieva failed to establish that she was personally at risk of

6

torture or that the government of Belarus acquiesces in torture.  Thus, the IJ ordered Godieva removed to Belarus.

## C.

Godieva appealed to the BIA, which affirmed in a September 19, 2019, decision.  The BIA found no clear error in the IJ's adverse credibility determination because the finding was based on "specific and cogent reasons," and it affirmed the IJ's denial of Godieva's application for asylum and withholding of removal based on the adverse credibility finding.

As support for the adverse credibility finding, the BIA cited the following: (1) Godieva omitted from her testimony, without reasonable explanation, several facts from her written statement, including the events on July 21, two conversations with the lead investigator, and a conversation with Shvedov's friends at her father's funeral; (2) she failed to adequately explain why Shvedov, after making her sign a note stating that she had stolen $128,000 from him in order to keep her silent, would then demand that she sign an agreement stating that she had borrowed $128,000 from him or complain to police that she had stolen from him; (3) her testimony regarding her November 2016 argument with Shvedov (in which he ultimately agreed to submit accurate reports) was inconsistent with the version of events in her written statement (in which Shvedov shouted at her and told her to mind her own business); and (4) she provided false information in support of her request for a visa

7

extension, stating that she did not intend to move to the United States and planned to return to an address in Minsk, when the evidence at the hearing showed that she had sold her home at that address before coming to the United States.

The BIA also affirmed the IJ's "alternative determination" that Godieva failed to meet her asylum burden because she did not establish a nexus between the alleged harm and a protected ground. The BIA noted that Godieva did not testify that she was politically active, and it found that she failed to present convincing evidence that Shvedov had ties to the Belarus government. Further, according to the BIA, merely objecting to Shvedov's fraudulent activities did not evince an anticorruption political opinion. As to the criminal complaint against her and the Interpol Red Notice, the BIA noted that criminal prosecution is generally not considered persecution on account of a protected ground. The BIA added that Godieva failed to establish that the criminal prosecution was a pretext for political persecution or that her likely punishment was severe enough to constitute persecution.

Finally, the BIA affirmed the IJ's decision to deny Godieva's CAT claim. It elaborated (with internal citations omitted) as follows:

> The respondent's Convention Against Torture claim is based on the same facts that the Immigration Judge found not credible for the respondent's asylum claim. Thus, the respondent has not established, independent of her own non-credible testimony, that she would more likely than not be tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity, upon removal to Belarus, for any reasons, even considering the country conditions evidence of record.

8

## II.

We review the BIA's decision as the final judgment unless the BIA expressly adopted the IJ's decision. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). Where the BIA agrees with the IJ's reasoning, we will review the decisions of both the BIA and the IJ to the extent of the agreement. *Id.*

We review factual findings, including credibility determinations, under the substantial-evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1254–55 (11th Cir. 2006). Review for substantial evidence is deferential and is based on a construction of the record evidence that is most favorable to the agency's decision. *Kazemzadeh*, 577 F.3d at 1350–51. We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1351 (quotation marks omitted). Findings of fact may be reversed only if the record compels a different result. *Id.* In other words, the mere fact that the record may support a different conclusion is not sufficient to justify reversal. *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1230 (11th Cir. 2007).

## III.

We first consider Godieva's challenge to the adverse credibility determination. Godieva argues that the BIA erred in affirming the IJ's adverse credibility determination because, in her view, the IJ committed clear error by relying in part on impermissible speculation.

9

As Godieva notes, however, "the BIA did not address the questions of impermissible speculation in the IJ's credibility finding, choosing instead to focus on other inconsistencies and omissions." Appellant's Br. at 18. And we do not review findings by the IJ that are not adopted by the BIA. *See Kazemzadeh*, 577 F.3d at 1350. We therefore we limit our review to the grounds cited by the BIA in upholding the adverse credibility determination.[1] *See id.*

To determine whether a petitioner's testimony is credible, the agency may consider the totality of the circumstances and all relevant factors, including (1) the petitioner's demeanor, candor, and responsiveness; (2) the plausibility of the petitioner's testimony; (3) the consistency between the petitioner's oral and written statements; (4) the internal consistency of each statement; (5) the consistency of the petitioner's statements with other evidence in the record; and (6) any inaccuracies or falsehoods in the petitioner's statements. 8 U.S.C. § 1158(b)(1)(B)(iii). Once an adverse credibility finding is made, the applicant bears the burden of showing that the credibility determination "was not supported by specific, cogent reasons or was not based on substantial evidence." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005).

---

[1] Godieva argues that the BIA failed to consider her argument that the IJ neglected to address the extent to which her testimony may have been affected by her diagnosed post-traumatic stress disorder. But neither in her brief to the BIA nor on appeal does she specifically state how this condition affected her testimony, so we cannot say that the BIA erred in implicitly rejecting this argument.

Here, the BIA's adverse credibility finding was based on specific and cogent reasons and supported by substantial evidence. *See id.* As the BIA noted, Godieva's testimony differed from her written statement concerning a November 2016 conversation with Shvedov. Additionally, the BIA stated that Godieva failed to reasonably explain Shvedov's actions on July 20 and July 21. Godieva testified that, on July 20, 2017, Shvedov forced Godieva to sign a note stating that she had stolen $128,000 from him to guarantee that Godieva would keep silent about his corrupt business practices. Given that she signed the note, we agree that it's unclear why, the next day, Shvedov would need an agreement stating that she had borrowed $128,000 from him. The BIA also found that Godieva omitted from her testimony, without reasonable explanation, certain facts from her written statement, including the October 2017 conversations that she wrote she had with a government investigator and the November 2017 conversation with Shvedov's friends at her father's funeral.[2]

Finally, the BIA relied on the fact that Godieva appeared to have given false information in support of her request for an extension of her visa in April 2018. Specifically, in requesting a visa extension, Godieva had indicated that she did not

---

[2] We cannot agree with the BIA's finding that Godieva failed to "reasonably explain" her failure to mention the events on July 21, however. She did, in fact, mention these events during the hearing, albeit not in her direct testimony. And she explained that she was nervous and simply forgot to mention these facts earlier. We fail to see why momentary forgetfulness in a stressful situation isn't a "reasonable explanation." *See, e.g.*, *Sankoh v. Mukasey*, 539 F.3d 456, 470 (7th Cir. 2008) ("Asylum hearings are human events . . . .").

intend to move to the United States and planned to return to a particular address in Minsk, but the record shows that Godieva sold her house at that address before coming to the United States in November 2017.

Based on the totality of the circumstances, the BIA's adverse credibility finding was based on specific, cogent reasons and supported by substantial evidence. *See Forgue*, 401 F.3d at 1287.  And because "[a] credibility determination, like any fact finding, may not be overturned unless the record compels it," *id.* (quotation marks omitted), we must deny Godieva's challenge on this ground.

## IV.

Next, we consider Godieva's claims for asylum and withholding of removal. Godieva challenges the BIA's decision to affirm the IJ's finding that she failed to prove a nexus between a statutorily protected ground and the harm she suffered in Belarus or feared suffering if returned to Belarus.

The government has the discretion to grant asylum if the applicant establishes, with reliable and specific evidence, that she is a "refugee."  8 U.S.C. § 1158(b)(1); *Sanchez Jimenez*, 492 F.3d at 1232.  A "refugee" is someone who is unable or unwilling to return to her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

Asylum eligibility may be established in two ways:  (1) demonstrating past persecution based on a protected ground, which creates a rebuttable presumption of future persecution; and (2) demonstrating a well-founded fear of future persecution on account of a protected ground.  *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230–31 (11th Cir. 2005).  A "well-founded fear" is one that is both subjectively genuine and objectively reasonable.  *Id.* at 1231.  "[O]nly in a rare case does the record compel the conclusion that an applicant for asylum has suffered past persecution or has a well-founded fear of future persecution."  *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010) (quotation marks omitted).

An applicant for withholding of removal must establish standards similar to, but more stringent than, those for asylum eligibility.  *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007); *see* 8 U.S.C. § 1231(b)(3)(A).  So a failure to establish eligibility for asylum generally means a failure to meet the higher standard for withholding of removal.  *Najjar v. Ashcroft*, 257 F.3d 1262, 1292–93 (11th Cir. 2001).

Here, Godieva has not shown that the record compels a result contrary to that reached by the BIA.  First, the record supports the BIA's determination that Godieva's past mistreatment at the hands of Shvedov was not on account of her alleged anti-corruption political opinion. Godieva testified that she was held captive, beaten, and threatened with death because she refused to cooperate with Shvedov, a

13

corrupt businessman with ties to the regime of the Belarusian president.  As the BIA noted, however, Godieva did not testify that she was politically active in Belarus, and she did not present evidence, beyond her own testimony, which the BIA found non-credible, establishing Shvedov's connections to the Belarus government. Moreover, retaliation for failing to cooperate with those engaged in criminal activity generally "does not constitute evidence of persecution based on a statutorily protected ground."  *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (quotation marks omitted); *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004) ("It is not enough to show that she was or will be persecuted or tortured due to her refusal to cooperate with the guerillas.").

Second, the record supports the BIA's finding that the prosecution against Godieva for financial fraud was not on account of an actual or imputed political opinion.  As the BIA noted, criminal prosecution on its own does not constitute persecution on account of a statutorily protected ground.  *See Scheerer v. U.S. Att'y Gen.*, 445 F.3d 1311, 1315–16 (11th Cir. 2006) ("Fear of prosecution under fairly administered laws . . . does not ordinarily entitle an alien to asylum or withholding of removal.").  Rather, the applicant must show that "the prosecution is based on a statutorily-protected ground."  *Id.* at 1316.

Godieva responds that the record shows that the Belarus government is corrupt and that, in the words of one of her expert witnesses, it uses Interpol Red

14

Notices to pursue "those that it regards as a threat to its corrupted authoritarian rule."

The record does not *compel* a conclusion that that's what happened in this case, however.    Aside from Godieva's testimony, the evidence equally supports an inference that the prosecution against her was initiated by Shvedov's complaint that she had stolen $128,000 from him and was not motivated by an intent to punish her for an actual or imputed political opinion. *See Rodriguez Morales*, 488 F.3d at 891 (affirming the BIA, despite evidence that "could support an inference of persecution because of his political beliefs," where "the evidence equally supports an inference that he was threatened simply because of his refusal to provide dental services"). Notably, Godieva was able to leave Belarus approximately three months after the start of the government's investigation of her and, before leaving the country, she was not arrested, she continued to work, and she was able to sell her home. Accordingly, we cannot say that the record compels reversal of the BIA's denial of asylum and withholding of removal.

## V.

Finally, Godieva contends that the BIA erred by denying CAT relief based solely on the adverse credibility determination and without considering her extrinsic evidence, which provided a separate, independent basis for granting relief.[3]

---

[3] Godieva also contends that the BIA failed to address several legal errors committed by the IJ, but, again, we review only the BIA's decision except to the extent that it adopts the IJ's decision. *See Kazemzadeh*, 577 F.3d at 1350. Because the BIA did not adopt the IJ's reasoning

Under CAT, the petitioner bears the burden of proving that it is "more likely than not that [she] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).  To obtain CAT relief, the petitioner must establish that the torture would be inflicted by the government. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004).

We agree with Godieva insofar as the agency cannot rely solely on an adverse credibility determination to decide an application where the "applicant produces evidence beyond [her] own testimony." *Ruiz*, 440 F.3d at 1255 (concerning asylum applications); *see also Shou Yung Guo v. Gonzales*, 463 F.3d 109, 114 (2d Cir. 2006) ("[A] CAT claim cannot be denied solely on the basis of an adverse credibility finding since a CAT claim may be established using different evidence and theories than those used for asylum claims.").  So if the applicant produces other evidence that bears on her claim to relief, the agency "must consider that evidence, and it is not sufficient for the [agency] to rely solely on an adverse credibility determination in those instances." *Forgue*, 401 F.3d at 1287 (concerning asylum applications).

In this case, Godieva's evidence beyond her own testimony included the following:  (a) a letter from Amnesty International to the IJ stating that Godieva could be "subject to arrest, detention, and/or torture, and ultimately an unfair trial"

---

and presented its own reasons for denying the CAT claim, we consider only the grounds expressed by the BIA.  *See id.*

16

if returned to Belarus; (b) an Interpol Red Notice issued at the request of Belarus stating that Godieva was a fugitive wanted for prosecution for misappropriating approximately $145,000 from Shvedov's companies; and (c) an expert report prepared by Ralph Clem, a professor at Florida International University, who wrote that Godieva's claims were plausible because Belarus was a "highly corrupt state" and "one of the most human rights abusive states in the world," "in which some of its citizens are beaten, imprisoned, and tortured by agents of the state," and it used Red Notices to go after "those that it regards as a threat to its corrupted authoritarian rule."  Godieva argues that the BIA's refusal to consider any of this evidence constitutes legal error.

In adjudicating an application for relief from removal, the BIA "must give reasoned consideration to an applicant's claims and make adequate findings" to enable meaningful appellate review.  *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1333 (11th Cir. 2019).  The agency must consider all the evidence introduced by the applicant, but it need not address specifically each claim made or each piece of evidence presented.  *Id.*  It must simply do enough to show that it "has heard and thought [about the case] and not merely reacted."  *Id.* at 1333 (quotation marks omitted).  We will vacate a decision where there is "some irreconcilable tension between the opinion and the record evidence," including where the BIA "fails to adequately explain its rejection of logical conclusions."  *Id.* at 1333–34 (quotation

marks omitted).  "Whether the Board has afforded a petition reasoned consideration is a question we review *de novo*."  *Id.* at 1333.

Here, the BIA's decision is sufficient to enable meaningful review.  In its opinion, the BIA found that Godieva's claim for CAT relief was "based on the same facts" as her asylum claim, and that "independent of her non-credible testimony," "even considering the country conditions evidence of record," she had not established a likelihood of torture upon removal to Belarus.  This shows that the BIA did not rely solely on the adverse credibility determination, as Godieva contends, and that it considered her country-conditions evidence.  Further, although the BIA did not expressly reference the Red Notice in resolving the CAT claim, it previously had discussed the Red Notice in resolving her asylum claim, and it concluded that she failed to establish that her likely punishment would be so severe as to constitute persecution.  It follows that the BIA likewise concluded that her likely punishment upon arrest and prosecution for financial fraud would not be so severe as to constitute torture.  Accordingly, while the BIA ultimately found Godieva's evidence insufficient for CAT relief, we cannot say there is "some irreconcilable tension between the opinion and the record evidence" or that the BIA "fail[ed] to adequately explain its rejection of logical conclusions."  *Id.* at 1333–34.  In short, the BIA gave reasoned consideration to her claims.  *See id.* at 1333.

To the extent Godieva argues that the record compels a conclusion that she would "more likely than not . . . be tortured if removed to the proposed country of removal," 8 C.F.R. § 208.16(c)(2), we disagree.  Although she presented some evidence consistent with that possibility, the fact that the record may support a different conclusion is not sufficient to justify reversal.  *See Sanchez Jimenez*, 492 F.3d at 1230.  Substantial evidence supports the BIA's conclusion that Godieva's evidence was insufficient to establish entitlement to CAT relief.  Accordingly, we must deny her petition as to the CAT claim as well.

**PETITION DENIED.**