[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 17-12656; 18-12627
Non-Argument Calendar
_____

Agency No. A206-305-847

NDUDI ADU,

                                                          Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                          Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals
_____

(September 18, 2019)

Before JILL PRYOR, NEWSOM and ANDERSON, Circuit Judges.

PER CURIAM:

Ndudi Benson Adu seeks review of the Board of Immigration Appeals' ("BIA") final order of removal following its denial of his claims for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Adu also asks us to review the BIA's denial of his motion to reopen proceedings and has filed a separate motion to remand the case to the BIA to consider new evidence. For the following reasons, we grant Adu's petition for review of the BIA's final order on his asylum, withholding of removal, and CAT claims and deny as moot his motions.

## I.    BACKGROUND

### A. Factual Background

Adu is a Nigerian citizen and a Pentecostal pastor. As part of his ministry, in July 2013, Adu traveled to northern Nigeria to preach. In sermons, Adu criticized Boko Haram, a terrorist organization in Nigeria comprised of radical Muslims. Adu was then attacked by six armed Boko Haram members who kidnapped him and took him to a nearby house. They beat him, cut his left arm with a knife, pointed a gun at him, detained him, warned him to stop preaching Christianity, and threatened to kill him. The Boko Haram captors eventually released Adu, who went to the hospital and was treated with hydrogen peroxide, bandages, and painkillers.

2

When Adu was released from the hospital, he relocated within northern Nigeria.  His relocation did not deter Boko Haram.  Approximately one week later, Boko Haram members found Adu.  They beat on his door, told him that he had been warned not to preach Christianity, and said that they had come to kill him.  They told him that they would break down the door and kill him.  Adu escaped through a window and fled to Lagos, in southern Nigeria, the next morning.

Back in Lagos, Adu's senior pastor reported the incident to the local police, who were unable to identify his attackers.  According to the police report, Adu's church, through its senior pastor Oluwarotimi Ibiyeme Johnson, reported that Adu had been attacked twice by Boko Haram in northern Nigeria.  The church reported to the police that "the Boko Haram sect ha[d] marked [Adu] out for destruction." AR at 1253.[1]  The police report further noted that officers advised Johnson to take all necessary measures to ensure that Adu was not seen by Boko Haram anywhere in Nigeria.  Following that advice, the church then directed Adu to attend a September 2013 conference at a church in the United States.  Adu was given a two-year visa to attend the conference but cancelled his trip when a colleague fell ill.

The next month, a Muslim woman, accompanied by a group of Muslim men, came to Adu's house in Lagos and asked his wife where he was; Adu was not at

---

[1] Citations to AR refer to the administrative record.

home.  The woman returned the next month, accompanied by one man.  Adu's wife answered the door, recognized the Muslim woman, and started to scream to warn Adu, who was in the shower.  The man hit Adu's wife in the face, and both visitors fled.  Adu stayed the night at Johnson's house, and he told his wife to stay with her mother in Agbor, also in southern Nigeria.  Neither location was safe.  Johnson warned Adu that a woman had visited Johnson's house earlier in the day, asking about Adu.  A few days later, a young Muslim boy approached Adu's wife and asked whether Adu had accompanied her to Agbor.

Adu's senior pastor then purchased a plane ticket for Adu to travel from Nigeria to Pennsylvania, where the 2013 conference had been held, so Adu could stay with the church there.  Adu traveled to the United States.  He explained to the U.S. customs officer that he was visiting to attend the (now-past) conference at the Pennsylvania church.  The customs officer told Adu that his visa had been revoked.  At that point, Adu confessed that he was fleeing Boko Haram and told the officer that he was seeking asylum.

## B.  Procedural History

The Department of Homeland Security charged Adu with removability; he applied for asylum, withholding of removal, and CAT relief.  He alleged that he had suffered past persecution and had a well-founded fear of future persecution by Boko Haram on account of his religion.  Adu's asylum application listed only the

4

two Boko Haram attacks in northern Nigeria and mentioned no past persecution in southern Nigeria.

### 1. Initial Asylum Decision

At an asylum hearing on February 25, 2014, Adu recounted his detention, attacks, and threats from Boko Haram.  He explained that he had offered inconsistent reasons for entering the United States to the U.S. customs officer because he had been confused and thought he had to give the same answers that he had given in the interview in Nigeria to obtain his visa.

The IJ denied Adu's claims for relief.  The IJ determined that some of Adu's testimony was not credible, citing his admission that he made false statements to U.S. immigration officials and the fact that Adu had not mentioned in his asylum application that Boko Haram had targeted him in Lagos.  The IJ nevertheless found that Adu presented credible testimony about the attacks on him in northern Nigeria. Even so, the IJ said, Boko Haram's treatment of Adu in northern Nigeria did not rise to the level of persecution.  The IJ also explained that Adu had not shown that the Nigerian government was unwilling or unable to protect him or that he could not avoid persecution by relocating to another part of Nigeria.  Finally, the IJ denied Adu's claim for CAT relief because he failed to show that he was at risk of harm by public officials or those acting with public officials' acquiescence.

5

On appeal, the BIA upheld the IJ's order.  After determining that the IJ did not clearly err in its credibility determination against Adu, the BIA agreed with the IJ that Adu's receipt of threats, his minor injuries, and his brief detention in northern Nigeria did not amount to persecution.  The BIA also agreed with the IJ that Adu's fear of future persecution was not well-founded because he had demonstrated neither that the Nigerian government was unwilling or unable to protect him from Boko Haram nor that he could not be safe from Boko Haram if he relocated within Nigeria.  Adu petitioned our court for review of the BIA's order of removal.

## 2.  First Motion to Reopen

While the petition was pending, in March 2015 Adu filed a motion to reopen with the BIA.[2]  In support of his motion, he stated that the day before his merits hearing, his wife and infant son had been murdered by reported Boko Haram members.  Adu also contended that he had newly discovered evidence to corroborate his testimony that he had received threats from Boko Haram not only in northern Nigeria, but also in Lagos.

The BIA denied the motion to reopen.  It concluded that Adu's evidence concerning his treatment in Lagos was previously available and thus was not new.

---

[2] Upon Adu's filing of a motion to remand, we stayed his case pending resolution of the motion to reopen.

It further concluded that the evidence Adu presented failed to demonstrate that his wife and son had been targeted on account of a protected ground, meaning the new evidence would not change the result in his case.

Upon review, we vacated the BIA's denial of Adu's motion to reopen. We did so at the urging of the United States government, which sought remand "so the agency may further consider the evidence offered in support of [Adu's] motion to reopen," namely the murders of Adu's wife and child. 11th Cir. CM/ECF, Case No. 15-10068, Doc. 47 at 1. We remanded the case to the BIA for further proceedings as outlined in Adu's motion to reopen, staying Adu's order of removal. On remand, the BIA granted the motion to reopen and remanded the case to the IJ to examine Adu's new evidence.

### 3. Second Asylum Decision

Upon remand, the IJ held a new hearing. The IJ permitted Adu to testify to the details of his wife's and son's murders. Adu explained that his wife was driving his son home from school in southern Nigeria when another car pulled up beside them. The driver said "Boko Haram" and "Allahu Akbar," then shot Adu's wife and son. AR at 269. Adu submitted at this hearing his wife's death certificate, a typed form containing handwritten answers. The form stated: "I saw her on the 24 of February, 2014" and "she was suffering from murdered by Boko Haram." AR at 693 (underlined words handwritten). He also submitted a police

7

station diary extract, which stated that the police had received a report that Adu's wife and son had been "slaughtered by Boko Haram" while driving home on the highway "after several threats on [Adu's wife's] life and that of her husband." AR at 695.

In addition, Adu submitted three threatening messages that had been sent to his church and then faxed to him by Johnson. Adu's church received these threats after Adu had left Nigeria but before Adu's wife and child were killed in southern Nigeria. The first message warned Adu to leave "Moslem brother country" because he was not Muslim, stating that "[a]ll infidels must die if they continue to stay here." AR at 621-22. The second message ordered Adu to stop preaching Christianity in the north because it was Muslim country. Significantly, the third message was entitled a "final warning" and stated that Adu had been warned about preaching Christianity but had not listened; it threatened that Adu and his family would die if he did not heed the sender's warning. AR 625-27. In addition, Adu's senior pastor submitted a declaration stating that he had received additional threats over the phone. In one message, the caller stated that Boko Haram had offered a bounty to anyone who could kill Adu and his family anywhere in Nigeria.

Adu also submitted declarations from his church colleagues and family, including Johnson; Peter Adu, his father; Augustine Obodo, a fellow pastor at Adu's church; and Mary Okoh, his mother-in-law. Johnson stated that Adu's wife

and son had been murdered by Boko Haram and that he reported their murders to the police, but the police had failed to meaningfully investigate the murders. Peter Adu also declared that Adu's wife and son had been murdered by Boko Haram, and that as a result, he and his family fled to Ghana for safety. Okoh recounted that Adu had called and told her that a member of Boko Haram had attacked his wife, striking her on the face, and so he was sending his wife and son to stay with Okoh in Agbor. Okoh noted that when Adu's wife arrived in Agbor, her face was swollen. Okoh also reported that Adu's wife and son had been murdered by Boko Haram, and she recounted the details of their murders as reported by an eyewitness. Obodo recalled that he had traveled to northern Nigeria with Adu. While there, he witnessed Adu return after an evening church service with a cut on his hand, torn clothing, and bruises all over his body; Adu had then explained to Obodo that he had been attacked by Boko Haram. Obodo also stated that he had heard Boko Haram had murdered Adu's wife and son in Agbor.

The IJ denied relief. The IJ determined that Adu failed to establish past persecution because he presented no credible testimony and corroborating evidence to support his claims. The IJ discounted the declarations of Adu's family and church colleagues because none was based on firsthand knowledge of the murders. The IJ also noted "serious concerns" about the death certificate Adu submitted because the certificate was filled out by hand and it was "not normally the province

9

of hospitals to identify the cause of death as being murdered by Boko Haram." AR at 224-25. The IJ concluded that Adu also had not proven that his wife's and son's murders had a clear nexus to his religious beliefs. As for the other incidents, the IJ said Adu's treatment had not risen to the extreme level required for persecution.

As for future persecution, the IJ explained that Adu had failed to show why Boko Haram would continue to be interested in him after he left northern Nigeria and determined that Adu failed to establish that the Nigerian government was unwilling or unable to protect him in southern Nigeria, where Christians were in the majority. For these reasons, the IJ denied asylum and withholding of removal. The IJ also concluded that Adu was ineligible for CAT relief because there was no evidence that any government official—or person acting with the government's consent—would harm Adu if he returned to Nigeria. Adu appealed that decision to the BIA.

The BIA affirmed the IJ's decision. The BIA first agreed with the IJ that Adu failed to establish past persecution because the events Adu described did not amount to persecution. The BIA agreed that Adu failed to demonstrate that his wife and son had been killed by Boko Haram or that their deaths were connected to Adu's preaching. The BIA next concluded that Adu failed to demonstrate a well-founded fear of future persecution because Nigerian country conditions made it implausible that Boko Haram would continue to be interested in Adu in southern

10

Nigeria.  The BIA determined that without past persecution or a well-founded fear of future persecution, Adu was ineligible for asylum.  Consequently, the BIA affirmed the IJ's determinations regarding withholding of removal and CAT relief.  Adu filed a petition for review.

### 4.  Motion to Remand and Second Motion to Reopen

In this Court, Adu filed a motion to remand his case to the BIA to supplement the record.  He explained that he had more new evidence regarding the murder of his father, Peter Adu, in Boji-Boji, Owa, Delta State in southern Nigeria.  That motion remains pending.

Before the BIA, Adu moved once again to reopen his case, filing his motion 10 months after the final removal order was entered in the reopened proceedings.  With his motion, Adu submitted the following evidence:  his father's housekeeper had answered a knock on the door to find "six armed Muslim looking [m]en, dressed in a militia uniform," who pointed a gun at her head and demanded that she lie on the floor.  AR at 26 (alterations adopted).  The men identified themselves as members of Boko Haram and demanded to know Adu's location.  Peter responded that Adu had sought protection in the United States.  The armed men beat Peter in the head and chest with their guns, murdering him.  Adu pointed out that his father was his third immediate family member to be murdered by Boko Haram in retaliation for his preaching in Nigeria.  He argued that this third family

11

member's death solidified his claim that it was Boko Haram members who perpetrated violence against him and his family to punish him for preaching Christianity, just as they had threatened to do, and that they had a continuing interest in doing so. He contended that Peter's murder further undermined the IJ's and BIA's conclusions that Adu could safely relocate to southern Nigeria; instead, it indicated that he could not relocate safely to any part of Nigeria.

Adu attached a personal declaration to his motion in which he explained that his father had fled to Ghana to escape Boko Haram, but Boko Haram continued to send Peter threatening messages there. Peter later returned to Nigeria because his health had deteriorated, and that is when he was murdered. Adu also attached the declaration of Ezinne Orji, his father's housekeeper, who witnessed the murder, and a declaration from Johnson, who reported the murder to the police. In addition, Adu submitted a police report recounting Orji's description of Peter's murder and concluding that Peter had been murdered by Boko Haram in retaliation for his son's failure to stop preaching Christianity and convert to Islam. Finally, Adu attached photographs of Peter's burial.

The BIA denied as untimely Adu's second motion to reopen the case. It explained that motions to reopen removal proceedings must be filed no more than 90 days after the entry of the removal order, but Adu's motion was filed more than 10 months after the entry of the removal order. The BIA then noted that Adu's

motion did not fall into any exception to the time limit. The BIA declined to exercise discretion to grant the untimely motion given the IJ's adverse credibility determination. Lastly, the BIA determined that Adu's evidence did not establish a *prima facie* case for relief.

Adu again seeks our review.

## II.    LEGAL STANDARDS

We review the BIA's decision only, except to the extent that it expressly adopts the IJ's decision. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Because the BIA did not expressly adopt the IJ's decision in this case, we review only the BIA's order.

We review factual findings, including credibility determinations, under the substantial evidence standard, viewing the evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the BIA's decision. *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011); *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) (internal quotation marks omitted). We will reverse the IJ's decision only if "the evidence compels a reasonable fact finder to find otherwise." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005) (internal

quotation marks omitted).  But if the BIA fails to discuss highly relevant evidence, its decision is incapable of review, and the case must be remanded to the BIA for further consideration.  *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327 (11th Cir. 2019).

We review the BIA's denial of a motion to reopen for abuse of discretion. *Gbaya v. U.S. Att'y Gen.*, 342 F.3d 1219, 1220 (11th Cir. 2003).  We limit our review to determining whether the BIA exercised its discretion in an arbitrary or capricious manner.  *Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009).

### III.    ANALYSIS

Adu challenges two final orders from the BIA:  its order denying his application for asylum, withholding of removal, and CAT relief and its order denying his second motion to reopen.  We discuss Adu's challenges to the two orders in turn.

### A. Final Order Denying Asylum

An applicant for asylum must satisfy the Immigration and Nationality Act's ("INA") definition of a refugee.  8 U.S.C. § 1158(b)(1).  A refugee is someone "unable or unwilling" to return to his home country "because of [past] persecution or a well-founded fear of [future] persecution on account of [the applicant's] race, religion, nationality, membership in a particular social group, or political opinion."

*Id.* § 1101(a)(42)(A). The applicant must demonstrate his refugee status with credible evidence. 8 C.F.R. § 208.13(a), (b).

An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *See Diallo v. U.S. Atty. Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010). The government can rebut the presumption by showing, by a preponderance of evidence, either (1) a fundamental change in circumstances in the applicant's country of nationality such that the applicant no longer has a well-founded fear of persecution because of a statutorily-protected ground, or (2) that the applicant could avoid future persecution by relocating to another part of his country of nationality, and—under all the circumstances—it would be reasonable to expect the applicant to relocate. 8 C.F.R. § 208.13(b)(1)(i)(A)-(B).

### 1. Past Persecution

Adu argues that the BIA erred in determining that he suffered no past persecution. The INA does not define "persecution." But we have explained that "[n]ot all exceptional treatment is persecution." *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000). Rather, persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda*, 401 F.3d at 1231 (internal quotation marks omitted). For example, we have held that a brief detention and minor bruising does not rise to the level of persecution. *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1174 (11th Cir. 2008). By contrast, we

have held that "intentionally being shot at in a moving car multiple times" constituted persecution. *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1233 (11th Cir. 2007). So too did "a minor beating" when combined with a detention and credible death threats. *See Diallo*, 596 F.3d at 1333-34. "A credible death threat by a person who has the immediate ability to act it on it constitutes persecution regardless of whether the threat is successfully carried out." *Id.* at 1334.

Here, Adu established that he suffered past persecution based on the two attacks by Boko Haram while he was in northern Nigeria. His testimony, which the IJ deemed credible, established that he was beaten and detained, and twice he received credible death threats. Adu described how he had been kidnapped by six Boko Haram members armed with guns and knives. The kidnappers detained him for two hours. During his detention, he was cut, beaten, and warned to stop preaching Christianity; the kidnappers pointed a gun at him and threatened to kill him. One week later, Boko Haram members located Adu, came to his home, told him that they had warned him to stop preaching Christianity, and announced that they would beat down the door and kill him. Adu escaped death only by climbing through a window and fleeing to a bus station. At the time that each death threat was made, the attackers had the immediate ability to carry out the threat. During the first attack, they were armed and cut and pointed a gun at him. In the second

16

attack, the attackers beat on Adu's door and threatened to break it down so that they could kill him.

Given this evidence, the record compels a conclusion that Adu received credible death threats and thus was subject to past persecution.  Because the IJ deemed credible Adu's accounts—a finding that the BIA did not disturb—establishing that credible death threats were made by individuals with an ability to immediately carry out the threats, no reasonable fact finder could reach the conclusion that Adu suffered no past persecution.  To find otherwise under these circumstances would essentially mean that nothing short of actually being killed would satisfy the standard.  Troublingly, although the IJ mentioned these attacks in its two decisions on Adu's asylum claim, the IJ failed to consider that during these attacks, Boko Haram members had twice issued credible, imminent death threats. The BIA failed to correct the IJ's omission.

## 2.  Well-Founded Fear of Future Persecution

Because Adu established past persecution, he is presumed to have a well-founded fear of future persecution.  *See Diallo*, 596 F.3d at 1332-33.  We therefore must vacate the IJ's determination that Adu failed to establish entitlement to asylum based on a well-founded fear of future persecution.  *See De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1010 (11th Cir. 2008).

The government can rebut the presumption of Adu's well-founded fear of future persecution by showing, by a preponderance of evidence, either (1) a fundamental change in circumstances in Nigeria such that Adu would longer have a well-founded fear of persecution based on his religion, or (2) that Adu could avoid future persecution by relocating to another part of Nigeria, and given all the circumstances, it would be reasonable to expect him to do so. 8 C.F.R. § 208.13(b)(1)(i)(A)-(B).

Here, the IJ improperly placed the burden on Adu to show that he could not avoid persecution by relocating within Nigeria. Because Adu established past persecution on account of a protected ground, the government, not Adu, had the burden to demonstrate that internal relocation was feasible and reasonable under all the circumstances of the case. *See id.* § 208.13(b)(1)(ii). Accordingly, we must remand for the IJ to correctly allocate the burden of proof then determine these questions in the first instance. *See De Santamaria*, 525 F.3d at 1012 (remanding to allow the IJ to make these determinations in the first instance, when the BIA's final order had determined in error that the applicant suffered no past persecution).

We note that our review of the record indicates that the IJ and the BIA selectively considered Adu's evidence and ignored evidence that corroborated his claims. For example, the BIA determined that "no evidence show[ed]" that Adu could not live safely in Lagos. AR at 4. But that was not the case. Adu presented

18

evidence that Boko Haram continued to target him and his family even after he left northern Nigeria.  After Adu returned home to Lagos, Boko Haram assaulted his wife and repeatedly threatened to kill him because he had not needed the warning to stop preaching Christianity, including by notifying his church that Boko Haram had offered a bounty to anyone who murdered Adu and his family.  Adu also presented indirect evidence supporting an inference that he and his family remained in danger in southern Nigeria.  For example, when Adu's senior pastor reported to the police in northern Nigeria that Boko Haram had assaulted Adu, the police advised Adu to avoid Boko Haram anywhere in Nigeria, showing that the police understood Adu was not safe from Boko Haram anywhere in in the country.  Additionally, although country conditions reports stated that Boko Haram was most active in northern Nigeria, they also acknowledged that Boko Haram "committed acts of violence . . . throughout the country."  AR at 311, 321.  We have emphasized that the BIA cannot "selectively consider evidence" and "ignore[] that evidence that corroborates" the applicant's claim.  *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1280 (11th Cir. 2009) (internal quotation omitted).

### 3.  Withholding of Removal

Having determined that Adu was ineligible for asylum, the IJ did not consider whether Adu had satisfied the more stringent requirements for establishing eligibility for withholding of removal.  Because the IJ has not yet

19

addressed this issue, the proper course is to remand.  *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002).  If the withholding of removal claim becomes relevant, the IJ should consider this issue, too, in the first instance upon remand.

## B. Motion to Reopen

Because we grant Adu's petition for review of the BIA's final decision on his asylum, withholding of removal, and CAT claims and remand, we need not consider whether the BIA improperly denied Adu's motion to reopen.  On remand from this Court, both parties should present to the IJ in the first instance arguments and evidence regarding the feasibility and reasonableness of internal relocation.  In these further proceedings, the BIA and IJ should consider all evidence that is relevant to Adu's claim.

## IV.    CONCLUSION

We grant Adu's petition for review of the BIA's final order on his asylum, withholding of removal, and CAT claims in case number 17-12656.  We vacate the decision of the IJ, as affirmed by the BIA, and remand for a determination of whether the government presented sufficient evidence to establish, by a preponderance of the evidence (1) that Adu could avoid future persecution by relocating within Nigeria, and (2) that, under all the circumstances, it would be reasonable for him to do so.  *See* 8 C.F.R. § 208.13(b)(1)(i)(A)-(B).  We deny as

20

moot the petition in case number 18-12627 where Adu seeks review of the BIA's

denial of his motion to reopen.[3]

**PETITION GRANTED in case number 17-12656.  VACATED and REMANDED.  PETITION DENIED in case number 18-12627.**

---

[3] Also pending is Adu's motion to remand to present new evidence of his father's murder, demonstrating eligibility for relief in case number 17-12656.  We lack jurisdiction to grant that motion, because our jurisdiction is limited to reviewing final orders of removal based on the evidence before the BIA when it ruled.  *See* 8 U.S.C. § 1252(a)(1), (b)(4)(A); *see also Forgue*, 401 F.3d at 1286 (concluding we "cannot find, or consider, facts not raised in the administrative forum").  We thus must deny Adu's motion.